# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KA-01095-SCT

*KENNETH EARL JONES, SR. a/k/a*

*KENNETH EARL JONES, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/12/1998 |
| TRIAL JUDGE: | HON. JERRY O. TERRY, SR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM WENDELL MARTIN |
| | WARREN LEON CONWAY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 3/29/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/19/2001 |

### EN BANC.

### SMITH, JUSTICE, FOR THE COURT:

¶1. Kenneth Earl Jones appeals to this Court from the Circuit Court of the Second Judicial District of Harrison County where a jury found him guilty of capital murder, and he was sentenced to life in prison without the possibility of parole. Jones's motion for directed verdict at the close of the State's case was denied by the trial court. The motion was re-urged after Jones rested his case and once again denied. Jones filed a motion for judgment notwithstanding the verdict, or alternatively, motion for a new trial which was denied. Aggrieved by the judgment, Jones timely perfected his appeal to this Court. Since the trial judge committed reversible error by failing to give the proper "two-theory" jury instruction in this wholly circumstantial evidence case, Jones's conviction of capital murder and sentence of life in prison are reversed, and this case is remanded for a new trial consistent with this opinion.

## FACTS

¶2. On May 25, 1996, Tanya Stallworth went to the home of Tammy and Jimmy Jones' in Gulfport, Mississippi, to attend a birthday party. She brought her three children to the party - Akeem, Sammy, and her youngest child, 13-month-old Edmond.

¶3. Around 1:00 p.m., Kenneth Earl Jones ( "Jones"), the brother of Jimmy Jones, arrived at Jimmy's home to clean and prepare for party guests. Tammy testified that Jones started drinking beer around 1:00 p.m. She claims that she saw Jones drinking beer, daiquiris, and brandy over the course of the afternoon and

evening. Jones, however, stated that he began drinking around 4:30 that afternoon. Regardless of which testimony is more accurate, Jones testified that by the end of the evening, he was so drunk that he could not walk.

¶4. Tanya Stallworth knew Jones well because they had once lived together and were once romantically involved. According to Tanya's testimony, she went to Tammy and Jimmy's home, with her three children, at one or two o'clock in the afternoon on May 25, 1996. She stayed at their home for a couple of hours and then took the boys over to her mother's home around four or five o'clock in the afternoon. Tanya returned to the party around six or seven o'clock by herself. At the party, Tanya drank two beers and talked to Kenneth Earl Jones and others. A little while later, Tanya's mother called her and told her to come and pick up the children. Tanya left the party, picked up her three children from her mother's home, and took two of her boys, Akeem and Sammy, to her father's home.

¶5. Tanya returned to the party around nine or ten o'clock that evening with her youngest child, 13-month-old Edmond. From the time Tanya picked Edmond up from her mother's home earlier in the evening until the time they left the party, Edmond had not appeared to be in any pain or to be hurting. In fact, Edmond was aware of his surroundings, as indicated by the fact that he sat in his mother's lap and ate. Edmond was very attached to his mother, and while they were at the party, Jones took Edmond away from his mother to show people how much of a "mama's boy" Edmond was. Whenever Jones would take Edmond away from his mother, the child would cry.

¶6. By the time Tanya had returned to the party with Edmond, the party was starting to wind down. She stayed at the party for another thirty minutes and left. Tanya, Edmond, and Jones, went to Jones's home. They brought Edmond inside the home, went into Jones's bedroom for several minutes, and Jones asked Tanya to spend the night. Tanya agreed to this, and left to go to her father's home to pick up the other two children. Tanya left Edmond in the bedroom with Jones and went to her father's home. At the time Tanya left, Edmond was awake, was not in any pain, and had started crying because his mother was about to leave. Jones testified that during this time, he was in the bathroom, went to the living room to watch television, and did not know where Edmond was located. Tanya arrived at her father's apartment, saw the two boys asleep, decided not to bring them to Jones's home, and carried them to her apartment. From the time she left Jones's home, went to her father's apartment, got the two boys, took them to her apartment, and walked back to Jones's home, Tanya testified this took about twenty to thirty minutes.

¶7. According to Tanya, when she arrived at Jones's house, Jones answered the door, handed Edmond to her and said, "Get your baby." Edmond was lifeless and his limbs were limp. In her testimony, Tanya stated that after asking Jones what was wrong with her baby, Jones replied, "Nothing, just sleeping." Jones further stated that he had just bathed Edmond and that nothing was wrong with him. Jones then took the lifeless boy from Tanya and brought him into Jones's bedroom. There, Jones placed the boy on his bed. Tanya became concerned that Edmond was not breathing, so Jones started to perform CPR on the boy.

¶8. Tanya called her mother, and her mother left to come over to Jones's apartment to take them to the hospital. A few minutes later, Tammy and Jimmy Jones arrived at Jones's home. While Jones went inside to get some clothes on, Tammy, Jimmy, and Tanya left him, so he ran to his sister's house to catch a ride to the hospital.

¶9. When Jones got to his sister's home, he telephoned to find out to which hospital the baby was taken. While he was on the phone, his sister left him at her home and went to the hospital. Tammy and Jimmy

dropped Tanya off at her apartment so she could get her other two children, and Tammy and Jimmy drove on to the hospital with Edmond. Tanya awoke her two boys, and they started walking to the hospital because they had been left. Tanya's mother drove by, picked them up, and took them to the hospital. From the time Edmond had stopped breathing until the time he got to the hospital, approximately fifteen to twenty minutes had passed.

¶10. Jimmy, Tammy, and Edmond arrived at Garden Park Hospital in Gulfport at approximately 1:45 a.m. Edmond had no signs of life when he arrived at the hospital, and he was pronounced dead at 2:36 a.m.

¶11. When the Garden Park Hospital emergency room doctors asked Tanya what had happened to Edmond, she lied to them stating that when she got home from the party, she tried to give Edmond a bath to break his 103 degree fever. She further stated that while she was trying to give him a bath, Edmond's eyes rolled into the back of his head, and he gasped for air. She also said that Edmond had diarrhea earlier in the day. At approximately 4:10 a.m., the police came to Tanya's mother's home to interview Tanya. She told the police the same story as she had told the doctors at Garden Park Hospital. She was also interviewed again at the police department, where she told the same story. Later in the morning, the police found Jones at his sister's home and interviewed him. He gave three statements in all, and in each statement Jones told investigators that he did not do anything to Edmond or know what had happened to him.

¶12. After the police interviewed Jones, Police Investigator Steven Schlicht went back to see Tanya. In this third interview, Tanya came forward with the truth. When asked why she lied to the police, she stated that she did not want them to think that Jones was involved in the death. She also said that she was scared and she did not want the police to think that she had anything to do with Edmond's death.

¶13. Dr. Paul McGarry performed an autopsy on Edmond's body. Dr. McGarry determined that Edmond died of several severe blows to the pancreas, liver, lungs, and mesentery. Also, Dr. McGarry testified that all the injuries occurred at the same time and that from the time the injuries occurred until Edmond's death, approximately ten minutes to an hour had passed. Other injuries were found by Dr. McGarry, such as older rib fractures, a scrotum injury, and a bruise to the forehead.

¶14. A jury found Jones guilty of capital murder, and he was sentenced to life imprisonment without parole.

¶15. Aggrieved by the judgment of the trial court, Jones raises numerous issues on appeal. Because we reverse on the issue of whether the trial court erred when it refused defense counsel's jury instructions, we address only that issue.

## ANALYSIS

¶16. Jones contends that the trial court erred in refusing his proposed jury instructions. Jury instructions "[a]re to be taken collectively rather than be given individual consideration. So long as all the instructions read together adequately and properly instruct the jury on the issues, an individual instruction given to the jury will not constitute reversible error." *Detroit Marine Eng'g v. McRee*, 510 So.2d 462, 467-68 (Miss. 1987). Furthermore, a trial court is not required to give instructions which are covered by other instructions, although the language may differ. *Davis v. State*, 431 So.2d 468, 475 (Miss. 1983). Jury instructions are to be granted only where evidence has been presented which support the instruction. *Copeland v. City of Jackson*, 548 So.2d 970, 973 (Miss. 1989).

### A. WHETHER THE TRIAL JUDGE ERRED WHEN HE DENIED INSTRUCTION D-4

**WHICH TOLD THE JURY THEY COULD NOT BASE THEIR DECISION ON MERE SUSPICION?**

¶17. Jones claims that the trial court erred when it refused his proposed instruction D-4. Defense instruction D-4 provided:

> The Court instructs the Jury that under the law no jury should nor has the right to convict the defendant upon mere suspicion, regardless of how strong that suspicion may be, nor simply because there may be a preponderance of evidence against the defendant, nor merely because there is or may be reason to suspect that the defendant is guilty.

> The Court now instructs you, ladies and gentlemen of the Jury, that suspicion, no matter how strong or how great or how convincing, never rises to the dignity of evidence under the law, and before a jury on oath can lawfully convict, they must be convinced upon the evidence and the evidence alone that the defendant is guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.

He argues that no other instruction adequately conveyed to the jury the importance of not basing their verdict of mere suspicion.

¶18. The trial court does not have to give cumulative instructions on "mere suspicion" when it has sufficiently instructed the jury on the appropriate burden of proof. "Suspicion" is the "apprehension of something without proof or upon slight evidence." Black's Law Dictionary 1447 (6ᵗʰ ed. 1990). The other jury instructions told the jurors that they could only find Jones guilty from the evidence and explained the heavy burden of proof. The instructions made it clear that if the State failed to meet that heavy burden, they must return a verdict of not guilty. For instance, instruction C-3 reads, in part, as follows:

> The law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the State of Mississippi the burden of proving the defendant guilty of every material element of the crime with which he is charged. Before you can return a verdict of guilty, the State must prove beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the Defendant is guilty.

Instruction D-14 told the jury to give the benefit of any reasonable doubt of the defendant's guilt arising out of the evidence or lack of evidence. Mere probability of guilt will never warrant convicting a defendant. The instruction charged the jury that they must find him guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence in order to find him guilty. The instructions went on to say that even if the jury believed him to be guilty, unless they could say he was guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that he was guilty, their sworn duty was to find him "Not Guilty."

¶19. As the record indicates, the trial court charged the jurors that they had to base their decision upon the evidence; they could not base their decision upon conjecture, speculation, or guesswork. Further, the court told the jurors they could not find him guilty if it was only probable that he was guilty. Even if they believed he was guilty, they could not find him guilty unless the evidence proved him guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with his innocence. Under *Heidel v. State*, 587 So.2d 835 (Miss. 1991 ), a court may refuse an instruction which incorrectly states the law, is

covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Id.* at 842. The record indicates that other jury instructions besides D-4 made it clear to the jury that the burden of proof was well beyond mere suspicion. Therefore, the trial court did not err in refusing proposed instruction D-4.

## B. WHETHER THE TRIAL JUDGE ERRED WHEN HE DENIED INSTRUCTION D-6?

¶20. Instruction D-6 reads, "The Court instructs the Jury that if you can reconcile the evidence upon any reasonable hypothesis consistent with Kenneth E. Jones, Sr.'s innocence, you should do so and find him not guilty." Jones argues that the trial judge committed reversible error when he refused this jury instruction.

¶21. The law is clear in this state that where *all* the evidence tending to prove guilt of defendant is purely circumstantial, the trial court must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict. *Henderson v. State*, 453 So.2d 708, 710 (Miss. 1984). This Court has also been clear in holding that the trial court is not required to instruct the jury repeatedly on a question of law. *Williams v. State*, 589 So.2d 1278, 1280 (Miss. 1991).

¶22. From the record, it is plain that the State attempted to prove this case through evidence that was entirely circumstantial. The State relied upon the fact that Tanya left Edmond with Jones, and at that time, Edmond was in good health. When she returned, he was struggling to breath and eventually stopped breathing altogether. The only other individuals at Jones's house that night were Jones's mother and Jones's son. The State also relied upon Dr. McGarry's testimony of what he observed when he performed the autopsy. The doctor stated that the cause of death was shock, circulatory collapse, and blood loss.

¶23. Since this case is based wholly on circumstantial evidence, the trial court granted several jury instructions that stated the requisite language of "every reasonable hypothesis other than that of guilt must be excluded in order to convict. " Instruction C-3 reads:

> The presumption of innocence attends the Defendant throughout the trial and prevails at its close unless overcome by evidence which satisfies the jury of his guilt *beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence*. The defendant is not required to prove his innocence.

(emphasis added). Instruction D-14 reads in relevant part, "It is only when on the whole evidence you are able to say on your oaths, beyond a reasonable doubt, and to the exclusion of every *reasonable hypothesis consistent with innocence that the defendant is guilty* that the law will permit you to find him guilty." (emphasis added). Also, instruction S-2 reads in relevant part, "If the state has failed to prove any one or more of these essential elements beyond a reasonable doubt, and to the *exclusion of every reasonable hypothesis consistent with innocence* then you shall find the Defendant, not guilty of Capital Murder." (emphasis added).

¶24. The trial judge did not commit reversible error by refusing jury instruction D-6. Other jury instructions used the requisite language required in *Henderson* for cases based purely on circumstantial evidence. In short, D-6 was cumulative since the court had instructed the jury on the same legal principles in instructions C-3, S-2, and D-14.

## C. WHETHER THE TRIAL JUDGE ERRED WHEN HE DENIED INSTRUCTION D-7?

¶25. Jones contends that the trial court erred in refusing to submit as part of the charge jury Instruction D-7.

Instruction D-7, in relevant part, states:

> The Court instructs the Jury that if there be a fact or circumstance in this case susceptible of two interpretations, one favorable and the other unfavorable to Kenneth E. Jones, Sr., when the Jury has considered such fact or circumstance with all the other evidence, if there is reasonable doubt as to the correct interpretation, you, the Jury, must resolve such doubt in favor of Kenneth E. Jones, Sr., and place upon such fact or circumstance the interpretation most favorable to him.

The State objected to D-7 on the basis that it was a comment on the evidence and was cumulative with regard to circumstantial evidence. The trial court held that the instruction was a comment on the evidence and denied it.

¶26. In a case where all the evidence tending to prove the guilt of the defendant is circumstantial, the trial court must grant two jury instructions. *See Parker v. State*, 606 So.2d 1132, 1140 (Miss. 1992); *Henderson*, 453 So.2d at 710. First, the court must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict. *Id.* (citing *Sanders v. State*, 286 So.2d 825, 828 (Miss. 1973); *Matula v. State*, 220 So.2d 833, 835 (Miss. 1969)). As stated previously, the trial court in this case did grant the typical circumstantial evidence instruction. However, in addition to giving instruction on circumstantial evidence, the trial court must grant a "two-theory" instruction such as D-7. *See Parker*, 606 So.2d at 1140; *Henderson*, 453 So.2d at 710. In the case at bar, the trial court refused to allow D-7, the two-theory instruction. The very same two-theory instruction as D-7 was at issue in *Henderson*. *Id.* This Court reversed and remanded for a new trial because the trial judge refused the two-theory instruction as well as the typical circumstantial evidence instruction. *Id.*

¶27. Because the evidence in this case is purely circumstantial, the jury should have received the two required instructions regarding circumstantial evidence. In this case, only the typical circumstantial evidence instruction was given. The exact situation occurred in *Parker*, and even though one of the required instructions was given, this Court still held that the trial court committed reversible error because the trial judge refused the two theory instruction. *Parker*, 606 So. 2d at 1140-41. Similarly, the jury in the case at bar was not fully and fairly instructed, and Jones's conviction must be reversed and this case remanded for a new trial for failure to give the two-theory instruction.

## CONCLUSION

¶28. Due to the trial judge's reversible error in failing to give the proper "two-theory" jury instruction in this wholly circumstantial evidence case, Kenneth Earl Jones's conviction of capital murder and sentence of life in prison are reversed, and this case is remanded for a new trial consistent with this opinion.

¶29. **REVERSED AND REMANDED.**

> **PITTMAN, C.J., BANKS AND McRAE, P.JJ., MILLS, WALLER, COBB AND DIAZ, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**