# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01112-COA

**JEFFREY MARTIN A/K/A JEFFERY EARL MARTIN A/K/A JEFFERY E. MARTIN A/K/A JEFFERY MARTIN**    APPELLANT

**v.**

**STATE OF MISSISSIPPI**    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/28/2017 |
| TRIAL JUDGE: | HON. STEVE S. RATCLIFF III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM ANDY SUMRALL |
| | THOMAS P. WELCH JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KAYLYN HAVRILLA MCCLINTON |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/06/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., CARLTON AND GREENLEE, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1.    Jeffery Martin[1] was convicted of one count of gratification of lust following a jury trial in the Circuit Court of Rankin County, Mississippi, and was sentenced to serve fifteen years in the custody of the Mississippi Department of Corrections (MDOC). Martin appeals, alleging ten issues: (1) the assistant district attorney (ADA) made a blatantly false statement during closing arguments; (2) the court erroneously excluded a video recording of a forensic interview conducted at the Child Advocacy Center (CAC); (3) the court erroneously refused

---

[1] The record contains varied spellings of Martin's first name. Because the indictment uses the spelling "Jeffery," we choose to abide by that variation.

to allow his witness, Sherry Martin, to testify; (4) the court erroneously refused three of his proposed jury instructions; (5) the court erroneously denied his motion for mistrial after prosecution witnesses, Investigator Anthony Joseph DiMartino IV—and, later, Deputy Charles Beemon—commented on his post-*Miranda*[2] behavior; (6) the State failed to disclose prior to trial that the victim was in special-education classes and potentially autistic; (7) the court erroneously denied his motion for a mistrial "after a number of the venire persons fled the courtroom in tears"; (8) the court erroneously denied his motion for a mistrial after it separated the jury foreman from the rest of the jury for a period of time after the jury announced that it had reached a verdict; (9) the court erred in denying his motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial; and (10) the cumulative errors warrant a reversal. Because we find no reversible error, we affirm.

## FACTS

¶2.     Sometime in late July 2016, M.G.[3]—the eleven-year-old female victim in this case—asked her mother, Amanda, how a person gets pregnant and where the "white stuff" comes from. Concerned, Amanda asked M.G. where she had received this information. M.G. replied that she had learned it from her grandfather, Martin. When Amanda questioned M.G. further, M.G. went on to describe a sexual encounter involving Martin that took place during the weekend of July 1-2, 2016, when M.G. was staying at Martin's house. Amanda

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966)

[3] Initials will be used to protect the privacy of the minor victim and all other minors referred to throughout this opinion.

immediately called her sister, Brandy, to ask if Brandy's fourteen-year-old daughter, J.M., had ever reported a similar incident. J.M. admitted to Brandy that on one occasion several years prior, Martin had molested her. Brandy conveyed this information to Amanda, and Amanda promptly reported M.G.'s story to the police. Investigator DiMartino with the Rankin County Sheriff's Department arranged for M.G. to be interviewed at the CAC for suspected child abuse.

¶3.    On August 4, 2016, M.G. was interviewed by Charlene Barnett, a forensic interviewer with the CAC. Investigator DiMartino observed the interview and, as a result of information conveyed therein, obtained a warrant for Martin's arrest. Martin was arrested shortly after the interview and was transported to the Rankin County Jail by Deputy Chase Beemon. He was indicted on October 18, 2016, for one count of sexual battery in violation of Mississippi Code Annotated section 97-3-95(1)(d) (Rev. 2014), and for two counts of gratification of lust in violation of Mississippi Code Annotated section 97-5-23(1) (Rev. 2014): one count involving M.G. and one count involving J.M. The count of gratification of lust involving J.M. was severed from this case.

¶4.    During a pretrial tender-years and 404(b)[4] hearing on April 17, 2017, Amanda testified regarding her daughter's disclosure of Martin's alleged abuse. She stated that M.G. had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD). She also stated that M.G. was enrolled in special-education classes at her school.

---

[4] M.R.E. 404(b).

¶5.     Also during the pretrial hearing, Barnett testified regarding the disclosures made by M.G. during the CAC interview.  The State introduced into evidence a full and un-redacted version of the video recording of the CAC interview.  On cross-examination, Martin's counsel questioned Barnett about the fact that during M.G.'s interview, M.G. had not only described sexual abuse inflicted by Martin, but also reported having had nonconsensual sexual encounters with her two minor male cousins in the months preceding the interview.  The State objected to references to sexual abuse by M.G.'s cousins on the basis that her sexual history with anyone other than Martin was irrelevant.  Martin's counsel argued that the information was relevant because it could provide an alternative explanation for how M.G. learned about pregnancy and the "white stuff."  The court agreed that the information that was sought to be elicited by Martin's counsel was relevant but, without ruling on the admissibility of either the video-recorded interview or the evidence regarding the sexual abuse inflicted by M.G.'s cousins, instructed defense counsel to move on.  At the conclusion of the hearing, the court stated that it would take the matter under advisement and inform the parties of its ruling after reviewing the video-recorded interview.

¶6.     Trial was scheduled to begin on May 2, 2017.  On that day, immediately prior to the commencement of trial proceedings, the State again requested that the court prohibit Martin's counsel from referencing M.G.'s sexual history with her cousins.  Martin's counsel argued that the State should have filed a motion in limine if it wanted to keep that information out, and that the time had passed to file such a motion.  The court, in response, ruled:

4

If [the CAC video-recorded interview is] played, and there's some statement made, obviously they're going to be able to cross-examine her on those statements. Those statements will be in, but if you don't play the tape, no notice that I've seen has been filed under [Rule] 412 [of the Mississippi Rules of Evidence], and because no notice is filed, I won't allow any of that testimony to come in.

At this point, the State offered a new, edited version of the CAC video-recorded interview, wherein the portions of the interview in which M.G. refers to sexual acts involving her cousins had been redacted. Martin's counsel objected to the introduction of this edited video recording and argued that he had not filed notice under Rule 412 because he had relied on the State's representations during the pretrial-motion hearing that it was going to play the full, unedited version of the video recording at trial. Thus, Martin's counsel argued that he had deemed it unnecessary to file notice under Rule 412, because the information regarding sexual abuse inflicted by M.G.'s cousins was going to come in anyway through the State's introduction of the full, unedited video recording. The court denied the State's redacted version of the video recording on the basis that it was not a complete representation of M.G.'s interview. It also rejected Martin's argument and offered the following explanation: "The State saying it [would offer the entire video] and the State doing it, that's just a possibility that the State would play it. . . . Notice would still have to be filed . . . on this." However, the court again declined to make a final decision regarding admission of the original, unedited video recording until it was offered during the trial.

¶7. Following this discussion, the court began the venire process. The court informed the prospective jury members that the case involved sexual battery and gratification of lust, and

5

one of the prospective jurors announced that she would not be able to sit as a juror because she had two granddaughters who had been sexually assaulted. The court excused her. Martin moved for a mistrial, and the court called for a bench conference. While the attorneys were at the bench, another venire member apparently stood up and left the courtroom "in tears," without being formally excused. Again, Martin moved for a mistrial, which the court denied. The court stated that it would not require that venire member to serve on the jury in the event that he or she returned. Martin maintains in his brief on appeal that a total of four members of the venire cried and were ultimately excused from serving on the jury.

¶8.     After jury selection and the commencement of trial, M.G. was the first to testify. She stated that, during the weekend in question, she had slept in Martin's bedroom with him. According to M.G., before going to sleep, Martin put her hand on his penis and instructed her to "[g]o up and down with [her] hand." Martin then instructed her to remove her clothes, at which point he also undressed and "got on top of [her]" so that his penis was touching her vagina. M.G. testified that Martin also touched her vagina with both his hand and his tongue. During this sexual encounter, Martin told M.G., "don't tell nobody," and remarked, "we're not supposed to be doing this." Martin also told M.G. that "the white stuff that comes out of him makes you pregnant." At some point, Martin got out of bed and went into the bathroom, and from where she was lying in bed, M.G. witnessed Martin masturbate and ejaculate. M.G. testified that a similar incident also occurred the next morning: Martin again got on top of her and positioned himself so that his penis was touching her vagina.

6

¶9.    Barnett testified as to the CAC forensic interview that she conducted with M.G. During cross-examination, Martin's counsel sought to play for the jury the full, unedited video recording. The State objected, reasserting its argument that Martin had not filed notice as required by Rule 412, and again offered its redacted version of the video recording. Martin's counsel again argued that he had not filed notice under Rule 412 because he had only recently learned that the State sought to offer a redacted version of the video recording and that he had relied on the State's representations at the pretrial hearing that it would be offering the full, unedited version. Martin's counsel further contended that he would have filed notice under Rule 412 if the State had supplied its redacted version of the video recording during the pretrial hearing when the issue was initially discussed. The court finally made the decision to exclude the video recording in its entirety and held:

> [T]here was no notice filed, so there was no intent or at least proposal from the Defense to bring up anything about the victim's past behavior that was on that -- on the video. I do not think the redacted video is admissible for that reason, but I also think that we've got the CAC counselor . . . . Any statements that would be admissible can be made by her. Under the tender years [doctrine,] any statements made by the victim about any prior sexual conduct is not admissible since no notice was filed. So the full video cannot be shown, and the redacted one is not going to be shown either.

¶10.    Next, Investigator DiMartino testified that he observed the interview conducted by Barnett at the CAC and immediately obtained a warrant for Martin's arrest upon its conclusion. The following conversation took place:

> [STATE]:            Following [Martin's] arrest, was he booked in at the sheriff's department?

7

[DIMARTINO]:     Yes. He was transported to the . . . sheriff's office. I requested that the patrolman who stopped him bring him to the criminal investigations division for me to speak with him. Which once they went over his Miranda rights, I asked him if he would like to speak to me, which he advised he did not wish to.

At this point, Martin's counsel objected on the basis that Investigator DiMartino had made an impermissible comment regarding Martin's behavior after being read his *Miranda* rights and moved for a mistrial, which the court denied.

¶11. Deputy Beemon with the Rankin County Sheriff's Department, who transported Martin to the sheriff's office on the day that he was arrested, testified next. The following conversation took place during the prosecutor's direct examination of Deputy Beemon:

Q.     And were his Miranda rights provided to him by you?

A.     Yes, sir.

Q.     And where was he at when you gave him his Miranda rights?

A.     In the rear of my marked patrol unit.

Q.     And after his Miranda rights were read to him by you, what, if any, statements did he make to you or in your presence? After you read him his Miranda rights?

A.     During the transit to the Rankin County Jail, you could hear Mr. Martin from the rear of my patrol car more or less praying, you know, stating, you know, "Lord, please be with me." You could hear him asking for forgiveness. Just pretty much praying.

¶12. The State also offered testimony from Amanda. She reiterated that M.G. had ADHD, that she was in special-education classes in school, and that "her school [had] recommended

8

that [M.G.] get tested for autism." Amanda went on to relate for the court how M.G. had begun asking her questions of a sexual nature, which is how she learned about Martin's alleged molestation of her daughter. Amanda testified that she cut off contact with her father; when she went to pick up some things of hers that had been at his house, her father had attached a note to her belongings reading, "Thank God for he forgives us for our sins. Glory be to Jesus. Love you." During Amanda's cross-examination, the following conversation took place:

> Q. [Amanda], are you worried about what's going to happen with all of Mr. Martin's things? Your father's things?
>
> A. No, I'm not.
>
> Q. Isn't it true that you made an attempt to get some of his stuff or to have some of it protected?
>
> A. Protected? I don't understand what you're asking me.
>
> Q. Have you had a conversation with Sherry Martin, [Martin's] estranged wife?
>
> A. Yes, I did.
>
> Q. And didn't you ask her not to divorce him so that she [sic] could be protected and get something out of his estate?
>
> A. I didn't ask her anything.
>
> Q. You didn't ask her that?
>
> A. No.
>
> Q. You're denying that today?

9

A.    I did not ask her for anything. I do not want any of his stuff.

Q.    But did you have a conversation with [Sherry]?

A.    Yes, I did.

¶13.    At the conclusion of the State's case-in-chief, Martin's counsel informed the court that he intended to call Sherry, Martin's estranged wife, to testify. The State objected, arguing that Sherry's testimony was irrelevant because it involved phone calls with Amanda that had nothing to do with the sexual abuse allegations. Martin's counsel replied that Sherry's testimony was relevant because it went to the defense's theory that Amanda and her sister, Brandy, had constructed a scheme to obtain their father's property. The State then cited Rule 608 of the Mississippi Rules of Evidence to argue that extrinsic evidence is not admissible to prove specific instances of conduct for impeachment purposes. The court held in favor of the State, holding that Sherry's testimony could not survive Rule 608 and was irrelevant; as such, it was inadmissible. However, the court did allow Martin to proffer Sherry's testimony at the conclusion of trial, during which she testified that she had previously spoken to Amanda on the phone and that Amanda had expressed concerns about what portion of her father's property she would receive if he was sent to jail.

¶14.    Once the defense rested its case, the court considered the jury instructions. It refused instructions D-1, D-2, and D-3 on the basis that the information contained therein had already been sufficiently covered in other instructions. Both parties then made their respective closing arguments. During the State's closing argument, the ADA made the following

statement: "[M.G.] got up here in front of you and discussed her first sexual encounter, and it was with her grandfather." Martin's counsel objected. The court sustained the objection and, at a bench conference, told the ADA, "That's not true. You stated that this was her first sexual—that was never in evidence. There's no way of knowing that. You can't state that." Martin's counsel moved for a mistrial, which the trial court denied.

¶15. At the conclusion of closing arguments, the jury retired for deliberations. After some period of time, the jury announced that it had reached a unanimous verdict; however, when the jury returned to the courtroom, the following conversation took place between the court, the foreman and another juror:

Q. Do you have a unanimous verdict? Sir, are you the foreman?

A. Yes.

Q. You have [a] unanimous verdict?

A. Yes.

Q. Would you hand it to the bailiff, please, sir.

(Foreman hands verdict to the bailiff.)

A. Judge, I need clarification on something.

Q. Wait. Do you have a question?

A. Yes, sir.

[COURT]: If you do, I'm going to need y'all to write it down[.] Is it coming from the jury, or is this just from you?

[FEMALE JUROR]: It's from all of us. We're just confused.

11

[FOREMAN]: Yeah, because of something you just said. I know that sounds confusing, but - -

[COURT]: I have not read the verdict. If you would, excuse them - - y'all can be excused. Write your question down, and you can bring it back in. Matter of fact, if you'd like to, do you know the question?

A. Yes.

Q. You do not need to all be excused. If the foreman can write this down, please.

A. Okay.

(Jury foreman exits courtroom.)

At this point, Martin's counsel again moved for a mistrial, which the court denied. Shortly thereafter, the jury foreman returned and gave the question to the trial judge. The court held that the question had no bearing on the verdict and was simply a request for clarification.

¶16. After further deliberation, the jury informed the court that it had passed a unanimous verdict convicting Martin of the gratification-of-lust charge but could not reach a unanimous decision as to the sexual-battery charge. The court sentenced Martin to fifteen years in MDOC's custody. Martin filed a motion for a judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial, which the court denied. He timely filed this appeal.

DISCUSSION

*1.    The ADA's Closing Argument*

¶17. Martin argues that the ADA intentionally lied when she said during her closing argument that the incident between Martin and M.G. was M.G.'s first sexual encounter,

12

because the ADA knew that fact to be untrue due to the CAC video-recorded interview, wherein M.G. told Barnett that she had previously had sexual encounters with her cousins. Martin contends that this statement unduly prejudiced Martin, warranting a mistrial. The State, in response, argues that the CAC video-recorded interview was not played for the jury, so "[i]t was immaterial to the jury whether M.G.'s sexual abuse was her first sexual encounter as they were not informed that she had also been sexually abused by her cousins." The State further argues that Martin failed to demonstrate that the ADA's statement resulted in prejudice to Martin.

¶18. "Any allegedly improper prosecutorial comments must be considered in context, considering the circumstances of the case, when deciding on their propriety." *Batiste v. State*, 121 So. 3d 808, 834 (¶39) (Miss. 2013).

> "Where prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice, reversal must follow." *Goodin v. State*, 787 So. 2d 639, 653 (¶41) (Miss. 2001) (citing *Acevedo v. State*, 467 So. 2d 220, 226 (Miss. 1985)). "*The standard of review which appellate courts must apply to lawyer misconduct during opening statements or closing arguments is 'whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.'*" *Wilson v. State*, 194 So. 3d 855, 864 (¶30) (Miss. 2016). "The purpose of a closing argument is to fairly sum up the evidence." *Id*. (citing *Galloway v. State*, 122 So. 3d 614, 643 (¶72) (Miss. 2013)). Prosecutors "are not allowed to employ tactics which are 'inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.'" *Id*. "The prosecutor may comment upon any facts introduced into evidence, and he may draw whatever deductions and inferences that seem proper to him from the facts." *Id*. "Counsel 'cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence.'" *Id*.

13

*White v. State*, 228 So. 3d 893, 904–05 (¶28) (Miss. Ct. App. 2017) (emphasis added).

¶19.   We agree with Martin that the ADA made a false statement when she said that M.G.'s first sexual encounter was with her grandfather.  No evidence was introduced at trial to suggest that this statement was correct.  In fact, the CAC video-recorded interview—which was not played before the jury but was introduced during the pretrial hearing and marked as an exhibit for identification during the trial—expressly contradicts this statement.  During her interview on August 4, 2016, M.G. told Barnett that the nonconsensual sexual acts with her cousins had been occurring for "months."  Taken as true, this statement is at odds with the ADA's statement that M.G.'s sexual encounter with her grandfather was her first, which did not occur until the weekend of July 1-2, 2016.

¶20.   However, we do not find that the natural and probable effect of the ADA's statement was such that it created unjust prejudice against Martin so as to result in a decision that was influenced by prejudice.  Prior to closing arguments, the court instructed the jury as follows:

> Counsel for both sides will now have an opportunity to address you and make their closing or final arguments.  The arguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but they are not evidence.  The attorneys in making these arguments to you will be commenting upon the testimony that you have heard and the evidence that has been presented in this case.  They, as you, will be recalling the evidence that has been presented.  They should not intentionally try to mislead you.  However, if their recollection of the evidence differs from what your recollection is, you must follow your own recollection.  *If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark.*

(Emphasis added).  Accordingly, the jury was properly instructed to disregard any statement

14

made by the attorneys during closing arguments that had no basis in the evidence. The law presumes that jurors follow the instructions given to them by the court. Further, we do not find that this statement created unjust prejudice to the extent that the jury's decision to convict Martin was based on it. We therefore find no merit to this issue.

### 2. Exclusion of the CAC Video-Recorded Interview

¶21. Martin argues that the court's decision to exclude the full, unedited CAC video-recorded interview on the basis that he failed to file notice pursuant to Rule 412 was erroneous because Rule 412 is inapplicable in this case. Martin also takes issue with the fact that the State offered the full and complete version of the video recording during the pretrial hearing on April 17, 2017, but then offered a redacted version just prior to trial on May 2, 2017. The State, in response, maintains that Rule 412 was applicable and that the court's decision was therefore proper. With respect to offering the redacted version of the interview on the day of trial, the State argues that "[t]he fact that a piece of evidence disclosed in discovery was not used or admitted into evidence at trial is not erroneous."

¶22. Rule 412 provides the following, in pertinent part:

(a) Prohibited Uses. *The following is not admissible in a criminal case involving an alleged sexual offense:*

(1) reputation or opinion evidence of a victim's past sexual behavior; and

(2) *evidence of a victim's past sexual behavior other than reputation or opinion, except under subdivisions (b) and (c).*

(b) Exceptions. **The court may admit evidence of:**

15

**(1) specific instances of a victim's past sexual behavior:**

> (A) with a person other than the defendant, if offered by the defendant to prove that someone else was the source of semen, pregnancy, disease, or injury;
>
> (B) with the defendant, if offered by the defendant to prove consent; and
>
> *(C) if constitutionally required to be admitted; and*

> (2) false allegations of sexual offenses made at any time before trial by the victim.

(c) Procedure to Determine Admissibility.

> (1) Motion. *A defendant who intends to offer evidence under subdivision (b) must:*
>
> > *(A) make a motion accompanied by an offer of proof describing the evidence;*
> >
> > *(B) file the written motion and offer of proof at least 15 days before trial, unless the court sets a later time*--including during trial--after determining:
> >
> > > (i) the evidence is newly discovered and with reasonable diligence could not have been discovered earlier; or
> > >
> > > (ii) the issue is newly arisen; and
> >
> > (C) serve all parties and the victim.

(Emphasis added).

¶23.    Martin contends that he did not intend to offer evidence of specific instances of M.G.'s past sexual behavior with a person other than the defendant to prove that someone else was the source of semen, pregnancy, disease, or injury under Rule 412(b)(1)(A); he did

16

not intend to offer evidence that M.G. consented under Rule 412(b)(1)(B); and he did not intend to offer evidence that M.G. made any false allegations of sexual offenses under Rule 412(b)(2). Martin also contends in his appellate brief that Rule 412 was amended following his trial and appears to suggest that Rule 412(b)(1)(C)—providing that the court may admit evidence of specific instances of a victim's past sexual behavior if constitutionally required to be admitted—was not in effect at the time of his trial, as he makes no argument with respect to that provision.

¶24.     Here, Martin sought to introduce evidence of M.G.'s prior sexual behavior to prove that M.G. could have learned from someone other than him that the "white stuff" (semen) could cause a female to become pregnant. Rule 412 is clear that all evidence of a victim's past sexual behavior is prohibited with certain exceptions, and the evidence of M.G.'s past sexual behavior contained in the CAC video-recorded interview is not one of the exceptions. Although Martin did not attempt to offer evidence of M.G.'s past sexual behavior pursuant to Rule 412(b)(1)(A), 412(b)(1)(B), and 412(b)(2), he did in fact seek to offer evidence of M.G.'s past sexual behavior, and Rule 412 prohibits introduction of all evidence of a victim's past sexual behavior, except as to evidence that falls within one of the exceptions.

¶25.     However, Martin is mistaken in his apparent belief that the exception provided in Rule 412(b)(1)(C) was not in effect at the time of trial. The current version of Rule 412, cited above, was last amended and went into effect on July 1, 2016, several months before Martin was indicted on October 18, 2016, and nearly a year before he was tried on May 2-3, 2017.

Martin failed to raise the argument at trial that M.G.'s past sexual behavior was constitutionally required to be admitted. As a result, this issue is procedurally barred; however, we will consider it under the plain-error doctrine because it implicates Martin's constitutional right to confront the witnesses against him.

¶26. "Under the plain-error doctrine, we can recognize obvious error that was not properly raised by the defendant and which affects a defendant's fundamental, substantive right." *Hingle v. State*, 153 So. 3d 659, 662 (¶6) (Miss. 2014) (internal quotation marks omitted). "Under both the United States Constitution and the Mississippi Constitution, an accused has a right to confront and cross-examine the witnesses against him." *Id*. at (¶7) (citing U.S. Const. amend VI; Miss. Const. art. 3, § 26). The Mississippi Supreme Court has "held that such a violation—i.e., a Confrontation Clause violation—is a violation of a fundamental, substantive right." *Id*. at (¶6) (internal quotation marks omitted). "For reversal under the plain[-]error doctrine, there must have been an error that 'resulted in a manifest miscarriage of justice.'" *Id*.

¶27. Here, Martin was accused of sexual battery and gratification of lust and being the source of M.G.'s knowledge that the "white stuff" causes a female to become pregnant—charges made against him by M.G. M.G. told Barnett what Martin did and testified herself about Martin's actions. It seems clear to us that evidence of M.G.'s past sexual behavior with her cousins was relevant and was admissible under the "constitutionally required" exception, Rule 401(b)(1)(C), as it provides a potential explanation for the source

18

of M.G.'s knowledge, other than Martin, about pregnancy and the "white stuff." Despite this fact, however, Martin failed to file notice under Rule 412.

¶28. Martin attempts to excuse and justify his failure to give the required notice by pointing out that there was no need for him to do so because the State had stated pretrial that it was going to introduce the entire CAC video-recorded interview. We agree with the sentiment expressed by the court during trial that "[t]he State saying it [would introduce the entire CAC video-recorded interview] and the State doing it" are two separate things. The mere possibility that the State may choose to play the CAC video-recorded interview was not enough to relieve Martin of his duty to file notice under Rule 412 if he wanted to introduce evidence of the specific instances of M.G.'s past sexual behavior that could explain how she may have learned about the "white stuff." As such, we find no error warranting reversal with respect to this issue. Additionally, we find no merit to Martin's argument that the State's action of introducing the entire CAC video-recorded interview during the pretrial hearing but submitting a redacted version at trial precluded him from complying with the requirements of Rule 412 to give notice by motion and offer of proof of M.G.'s past sexual behavior.

### 3. *Sherry Martin's Testimony*

¶29. Martin argues that the trial court erred in refusing to allow Sherry to testify. The State responds that Sherry's testimony was properly excluded pursuant to Rule 608 of the Mississippi Rules of Evidence.

¶30. Rule 608(b) provides:

19

Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:

> (1) the witness; or

> (2) another witness whose character the witness being cross-examined has testified about.

By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.

¶31. In support of his argument, Martin cites the Advisory Committee Note to Rule 608, which reads:

This absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness's character for truthfulness. The admissibility of extrinsic evidence offered for other grounds of impeachment, such as contradiction, prior inconsistent statement, bias, and mental or sensory capacity, is governed by Rules 402, 403, and 616 [of Mississippi Rules of Evidence].

Martin additionally cites Rule 616, which states, "Evidence of a witness's bias, prejudice, or interest—for or against any party—is admissible to attack the witness's credibility." Martin contends that Sherry's testimony should have been admitted because it would have served to contradict Amanda's testimony, and because it evidences that Amanda was biased or had interest in her father's property which she might be able to realize if Martin ended up incarcerated. The State, in response, argues that Martin incorrectly relies on Rule 616, because "[t]he general rule of admissibility of evidence under Rule 616 is subject to the trial

judge finding, in his exercise of discretion under [Rule 104 of the Mississippi Rules of Evidence], that evidence is relevant, under [Mississippi Rules of Evidence] 401 and 402, to the specific facts of the case." *Johnson v. State*, 756 So. 2d 4, 7 (¶7) (Miss. Ct. App. 1999). The State maintains that, because the trial judge still found Sherry's testimony to be irrelevant, Martin's argument is without merit.

¶32. We agree with Martin and hold that Sherry's testimony should have been admitted. First, it contradicts Amanda's testimony. Amanda testified at trial that she did not express concerns to Sherry regarding Martin's property. Sherry sought to testify to the exact opposite: that Amanda had expressed such concerns. As such, it was admissible for impeachment purposes. Second, Sherry's testimony should have been admitted on the basis that it presented potential bias against Martin. We, therefore, hold that the trial judge erred by prohibiting Sherry's testimony.

¶33. However, this error does not rise to the level of warranting reversal. "We review the trial court's rulings on the admission or exclusion of evidence for abuse of discretion. An error in the admission or exclusion of evidence is not grounds for reversal unless the error affected a substantial right of a party." *Moore v. State*, 1 So. 3d 871, 876 (¶18) (Miss. Ct. App. 2008). Here, the trial court erred in excluding Sherry's testimony. However, we do not find that Martin's substantial rights were affected by exclusion of this evidence. While Sherry's testimony did suggest a potential motive for Amanda, it did not, in our opinion, outweigh the other evidence presented—i.e., M.G.'s testimony—that Martin actually

21

committed the crime.  As such, although we find error, we do not deem it reversible error.

> 4.    *Jury Instructions*

¶34.    Martin argues that instructions D-1, D-2, and D-3 were improperly denied by the trial court.  The State, in response, asserts that the trial court's denial of D-1, D-2, and D-3 was not erroneous.

¶35.    In *Jones v. State*, 797 So. 2d 922, 926 (¶16) (Miss. 2001), the court succinctly addressed the standard of review of an appellate court with respect to jury instructions:

> Jury instructions "are to be taken collectively rather than be given individual consideration.  So long as all the instructions read together adequately and properly instruct the jury on the issues, an individual instruction given to the jury will not constitute reversible error." *Detroit Marine Eng'g v. McRee*, 510 So. 2d 462, 467-68 (Miss. 1987).

Furthermore, "a trial judge is not required to give instructions covered by other instructions, although the language may differ." *Sadler v. State*, 407 So. 2d 95, 98 (Miss. 1981).

¶36.    At trial, the court gave Instruction C-2, which reads as follows:

> The law presumes every person charged with the commission of a crime to be innocent.  This presumption places upon the State of Mississippi the burden of proving the Defendant guilty of every material element of the crime with which he is charged.  Before you can return a verdict of guilty, the State must prove that the Defendant is guilty beyond a reasonable doubt.  The Defendant is not required to prove his innocence.

Instructions D-1 and D-2, which Martin offered at trial, both set forth the defendant's entitlement to a presumption of innocence and provide that the State has the burden of proving the defendant's guilt beyond a reasonable doubt.  The court denied D-1 and D-2 on the basis that they were both cumulative of C-2, which, in the trial judge's opinion, "would

22

be easier for the jury to understand." We agree with the trial court that Instruction C-2 adequately addressed Martin's presumption of innocence and the State's burden. Thus, we find no error with the denial of D-1 and D-2 on the basis that they were cumulative.

¶37. Martin also offered D-3, which further elaborated upon the meaning of "guilty beyond a reasonable doubt" and included the sentence, "Before you can return a verdict of guilty, the State must prove beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the Defendant is guilty." The court denied D-3 on the basis that it, too, was cumulative of the other instructions already being given. Martin argued that D-3 was not cumulative because it mentioned "suspicion," which was necessary and had not been addressed by the other instructions being given. The court disagreed, denied D-3, and held that the word "suspicion" was not necessary here, and that the court's given instructions succinctly and effectively instructed the jury.

¶38. On appeal, Martin cites *Jones*, 797 So. 2d at 926 (¶18), in which the court held that "[t]he trial court does not have to give cumulative instructions on 'mere suspicion' when it has sufficiently instructed the jury on the appropriate burden of proof." Martin argues that, here, the instructions were required to include reference to "suspicion" because the other given instructions failed to sufficiently address the jury regarding the State's heavy burden of proof. We disagree and find that the given jury instructions, when taken together, adequately addressed the burden of proof such that D-3 was not required, and would have been cumulative. We consequently find no error with respect to the court's denial of D-1,

D-2, or D-3.

### 5. Comments Regarding Martin's Post-Miranda Silence

¶39. Martin argues that the court erred in allowing Investigator DiMartino to testify regarding the statements he made in the patrol car after his *Miranda* rights had been read to him. Specifically, Martin takes issue with the following statement made by Investigator DiMartino: "Which once they went over his Miranda rights, I asked him if he would like to speak to me, which he advised he did not wish to." Martin maintains that the error was further exacerbated during the State's direct examination of Deputy Beemon, when Deputy Beemon described Martin praying in the back of the patrol car. Martin did not specifically move for a mistrial following Deputy Beemon's testimony, but he groups the two witnesses' testimony together on appeal. In response, the State maintains that Investigator DiMartino's testimony did not result in prejudice to Martin; as such, the trial court's denial of Martin's motion for a mistrial was not improper.

¶40. "When reviewing challenges to comments on post-*Miranda* silence, we are generally faced with a trial court's denial of a motion for a mistrial, which we review for abuse of discretion." *Smith v. State*, 90 So. 3d 122, 126 (¶9) (Miss. Ct. App. 2012). "It is improper and ordinarily, reversible error to comment on the accused's post-*Miranda* silence." *Id*. at 127 (¶12) (internal quotation mark omitted). However,

> the mere mention of a defendant's refusal to give a statement does not, in all instances, require reversal. Instead, we review such comments on an individual basis. The proper test for determining if a comment on a defendant's post-*Miranda* silence amounts to reversible error is *whether the*

24

*natural and probable effect of the statement is to create an unjust prejudice against the accused resulting in a decision influenced by prejudice.*

*Id*. (emphasis added) (internal quotation marks and citations omitted).

¶41. Pursuant to this standard, we do not find that Investigator DiMartino's comment regarding Martin's post-*Miranda* behavior had the natural and probable effect of the statement so as to create an unjust prejudice which influenced the jury's decision. Nor do we find that Deputy Beemon's comments exacerbate any error by Investigator DiMartino. As stated, there is ample evidence in the record to support the jury's decision to convict Martin, and we do not find that Investigator DiMartino's statement—or Deputy Beemon's description of Martin's behavior in the police car—created an unjust prejudice resulting in the jury's decision. This issue is without merit.

### 6. *Failure to Disclose Special-Education Classes and Possible Autism*

¶42. Martin argues that he was never informed prior to trial that M.G. was in special-education classes and was possibly autistic, which was relevant information "[a]s the proof in this case revolved almost exclusively around the credibility of the alleged victim." Martin further maintains that the court was prejudiced by the State's failure to disclose this information, as it was unable to properly rule regarding M.G.'s "mental and emotional age" with respect to the tender-years hearsay exception set forth in Rule 803(25) of the Mississippi Rules of Evidence. The State, in response, maintains that the trial court was notified of M.G.'s ADHD and enrollment in special-education classes before it rendered its decision at the tender-years hearing. Further, the State argues that Amanda testified at trial only that

25

M.G.'s school recommended her for autism testing, not that she was definitively autistic. The State maintains that the fact that this information was not revealed under after the tender-years hearing is insufficient to prejudice Martin.

¶43.    Rule 803(25) provides an exception to the hearsay rule if the declarant is of tender years:

> A statement by a child of tender years describing any act of sexual contact with or by another is admissible if:
>
>> (A) the court – after a hearing outside the jury's presence – determines that the statement's time, content, and circumstances provide substantial indicia of reliability; and
>>
>> (B) the child either:
>>
>>> (i) testifies; or
>>>
>>> (ii) is unavailable as a witness, and other evidence corroborates the act.

"This Court reviews the trial court's admission or exclusion of evidence for abuse of discretion." *Brown v. State*, 119 So. 3d 1079, 1082 (¶11) (Miss. Ct. App. 2013) (internal quotation mark omitted). "Additionally, there is a rebuttable presumption that a child under the age of twelve is of tender years." *Id*. "Once the trial court determines that the child is of tender years, the court must determine if the child's statements contain 'indicia of reliability.'" *Id*. at (¶12). In making such a determination, the trial court may consider the following factors:

> (1) whether there is an apparent motive on declarant's part to lie; (2) the general character of the declarant; (3) whether more than one person heard the

26

statements; (4) whether the statements were made spontaneously; (5) the timing of the declarations; (6) the relationship between the declarant and the witness; (7) the possibility of the declarant's faulty recollection is remote; (8) certainty that the statements were made; (9) the credibility of the person testifying about the statements; (10) the age or maturity of the declarant; (11) whether suggestive techniques were used in eliciting the statement; and (12) whether the declarant's age, knowledge, and experience make it unlikely that the declarant fabricated.

*Id*. at 1082-83 (¶12).

¶44. We first note that Martin failed to object during trial once Amanda testified that M.G. had been recommended for autism testing. Notwithstanding that fact, we agree with the State, and find that the trial court did not abuse its discretion in deciding that there was sufficient evidence presented at the tender-years hearing to make a determination regarding M.G.'s mental and emotional age. The trial judge made a detailed statement on the record regarding his consideration of the relevant factors in determining whether he would allow M.G. to testify. This statement was made following Amanda's testimony at the pretrial hearing that M.G. had ADHD and was enrolled in special-education classes at school, and following his viewing of the CAC interview video recording. We do not find that the mere fact that M.G.'s school had recommended her for autism testing, which was not revealed until Amanda's testimony at trial, would have altered the trial judge's decision to allow M.G. to testify. As such, we find this issue without merit.

7.      *Members of the Jury Leaving in Tears*

¶45. Martin argues that the court erred in refusing to grant a mistrial after "a number of venire members began crying" after the charges were read. Martin cites *Beasley v. State*, 74

27

So. 3d 357 (Miss. Ct. App. 2010), in support of his argument. The State, in response, contends that this matter is distinguishable from *Beasley* in several key respects and asserts that Martin suffered no prejudice warranting a mistrial.

¶46. "We review a trial court's refusal to quash a jury panel or declare a mistrial under an abuse-of-discretion standard." *Id*. at 363 (¶28). "To obtain reversal based on a trial court's refusal to quash a jury panel or grant a mistrial, the defendant must show prejudice." *Id*.

¶47. In *Beasley*, the following transpired:

> During voir dire, the trial judge informed the jury panel that Beasley was charged with fondling and sexual battery of a child. The judge asked panel members if, knowing the nature of the case, they could be fair and impartial. Juror 28 responded that she could not. At some point, she allegedly became emotional and started crying. Defense counsel later posited that Juror 28 "started crying a while ago and is apparently continuing to cry and dabbing her eyes." The judge responded, "She looks fine to me[.] I'm not going to single her out and throw her off the jury panel[.] If it gets worse, I'll consider it."
>
> The judge later struck Juror 28 for cause. Defense counsel then moved to also strike Jurors 27 and 29—who sat beside Juror 28—for "consoling" Juror 28. But defense counsel admitted not knowing "if she's told them anything or what she said to them." The judge denied the challenge. Defense counsel then moved to strike the entire venire alleging that the disruption was worsened because "a bailiff got her a tissue." The court denied this request as well. Following voir dire, the State exercised peremptory challenges to strike Jurors 27 and 29.

*Id*. at 362-63 (¶¶25-26). On appeal, Beasley argued that "the judge should have immediately ordered Juror 28 to exit the courtroom," "the judge should have given a curative instruction to limit the effects of Juror 28's actions," and "the judge should have specifically inquired into the ability of the potential jurors to disregard her alleged disruption." *Id*. at 363 (¶27).

28

This Court held that Beasley failed to show any resulting prejudice, and we therefore refused to find that the trial court abused its discretion in refusing to strike the venire or grant a mistrial. *Id*. at 364 (¶32).

¶48.    Here, Martin argues that the errors occurring in his trial are even more damning than those committed in *Beasley*. Thus, he argues that the trial court erred in refusing to grant a mistrial. However, we do not find that Martin showed that he suffered prejudice such that a mistrial was warranted. This issue is without merit.

    8.    *Jury's Question and Separation of the Foreman*

¶49.    Martin argues that the court erred in refusing to grant a mistrial after separating the jury foreman from the rest of the jury as he wrote down a question on behalf of the rest of the jury. Martin cites *Kirk v. State*, 160 So. 3d 685, 702 (¶53) (Miss. 2015), for the proposition that the separation of the jury during deliberations "could in some circumstances constitute reversible error." The State, in response, asserts that Martin misapplies *Kirk* and showed no evidence that Martin suffered prejudice as a result of this incident such that a mistrial was warranted.

¶50.    In *Kirk*, the trial judge separated the jury foreperson from the rest of the jury after the foreperson told the judge that the jurors were unable to reach unanimity. *Id*. at 700 (¶47). The judge instructed the jury foreperson "to stand out in the hall without going back into the jury room." *Id*. Kirk alleged that this constituted reversible error, citing the proposition from *Wilson v. State*, 248 So. 2d 802, 804 (Miss. 1971), that "the defendant in a prosecution for

29

[a] felony is entitled to have the jury kept together without exception from the time it is selected until finally discharged. The separation of even one juror in such cases is an irregularity which will vitiate the verdict." *Id*. at 701 (¶50). The court clarified that the language Kirk cited from *Wilson* only applies to *capital* cases. *Id*. at (¶51). It further held that in both capital and non-capital cases "[t]rial courts should not separate the jury during deliberations," but declined to find that this one instance of separating the foreperson from the rest of the jury was so egregious that it had any identifiable prejudicial effect on the jury. *Id*. at 702 (¶53). The court went on to caution the bench and bar "that this sort of practice could in some circumstances constitute reversible error and scrupulously should be avoided." *Id*.

¶51. Like the *Kirk* court, we do not find any identifiable prejudicial effect on the jury as a result of this singular instance of separating the jury foreperson from the rest of the jury. While acknowledging the *Kirk* court's admonition against separation of the jury, we do not believe this matter rises to the level of reversible error. Thus, we find this issue without merit.

### 9.   *Motion for JNOV or, in the Alternative, a New Trial*

¶52. Martin argues that the court erred in denying his motion for JNOV or, in the alternative, a new trial. The State, in response, maintains that the weight and sufficiency of the evidence supported the guilty verdict.

### A.   *Sufficiency of the Evidence*

30

¶53. Our appellate courts have consistently reviewed arguments regarding motions for JNOV under the following standard:

> A motion for directed verdict challenges the sufficiency of the evidence, and the critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed. In judging the sufficiency of the evidence, the trial judge is required to accept as true all evidence that is favorable to the State, including reasonable inferences that may be drawn therefrom, and to disregard evidence favorable to the defendant.

*Jackson v. State*, 68 So. 3d 709, 719 (¶32) (Miss. Ct. App. 2011) (internal quotation marks and citations omitted).

¶54. Based on the evidence presented at trial and giving the State the benefit of all reasonable inferences that may be drawn therefrom, we hold that reasonable jurors could find that Martin committed the act of gratification of lust against his granddaughter, M.G. We find this issue without merit.

### B. Weight of the Evidence

¶55. When reviewing whether a conviction in a case is contrary to the overwhelming weight of the evidence and warrants a new trial, "we defer to the discretion of the trial judge, and we will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice." *Id*. at 720 (¶37) (internal quotation marks and citations omitted).

¶56. Again, based on the evidence presented at trial, we do not find that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to

sanction an unconscionable justice.

### 10. Cumulative Errors

¶57. Martin argues that the cumulative errors committed during trial warrant a reversal. The State, in response, maintains that there can be no cumulative error because there are no individual errors.

¶58. As explained above, we find error with respect to the court's refusal to allow Sherry Martin to testify. "When faced with an error, [appellate courts] must review the record de novo to determine whether reversal is warranted." *Williams v. State*, 991 So. 2d 593, 599 (¶20) (Miss. 2008). "Harmless[ ]errors are those which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id*. Looking at the record as a whole, we are satisfied in saying that inclusion of Sherry's testimony would not have impacted the outcome of the case. We find no other instances of error that could cumulatively warrant reversal. Therefore, the court's judgment is **AFFIRMED.**

**LEE, C.J., GRIFFIS, P.J., BARNES, CARLTON, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**