# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00360-COA

**MALCOLM McLAUGHLIN**                                   **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/26/2019 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER, BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/17/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. A jury convicted Malcolm McLaughlin (McLaughlin) of capital murder, third-degree arson, conspiracy, and felon in possession of a firearm in Hinds County, Mississippi. The Hinds County Circuit Court sentenced McLaughlin to serve life in prison for the capital murder of Kiaris Porter (Porter). McLaughlin was also sentenced to serve three years for the conviction of third-degree arson, five years for the conviction of conspiracy, and ten years for the conviction of felon in possession of a firearm. The court ordered these sentences to run concurrently with one another, and McLaughlin would serve them in custody of the

Mississippi Department of Corrections (MDOC). McLaughlin filed a motion for a new trial or judgment notwithstanding the verdict (JNOV). The trial court granted the motion as to McLaughlin's conviction for felon in possession of a firearm, set that conviction aside, and dismissed that charge, but the court denied the motion as to the other three convictions. McLaughlin appealed.

¶2. McLaughlin raises six issues on appeal: (1) the evidence was insufficient to support the conviction of capital murder; (2) the evidence was insufficient to support the conviction of third-degree arson; (3) the evidence was insufficient to support the conviction of conspiracy; (4) the State violated McLaughlin's *Miranda*[1] rights by asking Detective Jermaine Magee (Detective Magee) about McLaughlin's decision not to provide a statement to police; (5) the trial court erred in allowing a photograph to be admitted into evidence; and (6) the retroactive misjoinder of McLaughlin's felon in possession of a firearm conviction entitles McLaughlin to a new trial for the charges of capital murder, third-degree arson, and conspiracy. Upon review of the record, this Court finds that the evidence was sufficient for each of the convictions. McLaughlin is procedurally barred on appeal from raising an issue for the alleged right to remain silent violation, but in considering the issue, this Court finds there is no plain error because of the overwhelming evidence presented against McLaughlin. Further, we find that the trial court did not err in admitting a photograph into evidence, and retroactive misjoinder does not apply. Therefore, the trial court's judgment is affirmed.

## FACTS AND PROCEDURAL HISTORY

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶3. On April 29, 2016, Porter was found deceased at a dead end on Noble and Faulks Boulevard in Hinds County, Mississippi. His left pocket was turned inside out, indicating he had been robbed. The police were called to the scene and started their investigation. They quickly determined that Porter had been shot in the back of the head. Their investigation revealed the events leading up to Porter's death.

¶4. On April 28, 2016, the day before Porter's body was found, Zamarious Harden (Harden) saw Shaneka Brown (Brown) riding in a black Dodge Charger with McLaughlin. Harden got in the vehicle, and McLaughlin asked Harden if he knew anyone who would want to buy the vehicle. Harden named the victim, Porter, as a potential buyer. McLaughlin, Harden, and Brown picked up Keishawn Rose (Rose) and rode to Porter's home that evening. Porter looked at the black Dodge Charger, and told McLaughlin to come back the next morning, and he would buy the vehicle because Porter would have money to pay for the vehicle then.

¶5. On April 29, 2016, McLaughlin, Brown, Harden, and Rose picked up Porter from his home and drove to the bank. Porter withdrew $733.00. They left the bank, stopped at a library to check the registration on the vehicle, and then drove down to a dead end on Noble and Faulks Boulevard. While on the dead-end road, Brown, who was sitting in the back seat, pointed a gun at Porter's head and demanded that he give her his money. Then, Brown shot Porter in the head two times. McLaughlin took the money out of Porter's pocket, and he, Harden, and Rose took Porter out of the black Dodge Charger and left him in the middle of the road. Officers arrived at the scene later that morning to begin their investigation. That

3

evening, the police responded to a call about a burning black Dodge Charger. The vehicle had been "burned beyond recognition."

¶6. Officers began identifying suspects after Harden posted on Facebook, saying, "[I]t was messed up what Mack did to my boy KJ."[2] McLaughlin was ultimately arrested after he was spotted sitting in a green Ford Explorer. McLaughlin did not give a statement to police. Harden and Rose were also arrested, and both gave statements to police. Brown was arrested and did not give a statement to police. Brown and Harden pled guilty and agreed to testify on behalf of the State and against McLaughlin. Rose pled guilty to second-degree murder.[3] On May 2, 2019, the grand jury of Hinds County, Mississippi, indicted McLaughlin on four counts: capital murder, third-degree arson, conspiracy, and felon in possession of a firearm.

¶7. At trial, the State called nine witnesses to testify about McLaughlin's involvement in the armed robbery, Porter's death, and the burning of the black Dodge Charger. The State's first witness was Detective Magee. Detective Magee testified that on April 28, 2016, McLaughlin tried to sell a stolen black Dodge Charger to Porter after Zamarious Harden (Harden) introduced them to each other. That evening, Porter looked at the vehicle, but he did not have the money to purchase it. Detective Magee testified that Porter told McLaughlin to come back the next morning, April 29, 2016, because his "disability check" would be

---

[2] Detective Magee testified that "Mack" was McLaughlin's nickname, and Porter's nickname was "KJ."

[3] The record does not indicate if Rose agreed to testify for the State. Rose ultimately testified for McLaughlin at trial.

4

deposited by then. Detective Magee stated that at 8:00 a.m. the next day on April 29, 2016, McLaughlin returned to Porter's house in the black Dodge Charger. Brown, Rose, and Harden were also in the vehicle. McLaughlin drove everyone to the bank, where Porter made two cash withdrawals–one for $700.00 and one for $33.00. Detective Magee stated that the video-surveillance footage from the bank showed Porter getting money from a bank teller, putting the money into a white envelope, and getting into a black Dodge Charger. Detective Magee testified that McLaughlin, Porter, Brown, Harden, and Rose then went to the library to calm Porter's concern and assure him that the vehicle had not been stolen. However, the library was closed. After the library, they drove to a dead end on Noble and Faulks Boulevard where Porter was shot in the head twice, robbed, and left face-down on the street. Each occupant of the vehicle received part of the $733.00 that Porter had in his pocket from his bank withdrawals earlier that morning.

¶8.    Detective Magee stated that the police department was called at 9:24 a.m. on April 29, 2016, about Porter's body being found in the street. Detective Magee testified that when he arrived on the scene, he saw Porter's body lying face-down in a "pool of blood." When the coroner turned Porter's body over, Detective Magee noticed Porter's left pocket had been "turned inside out." Detective Magee also testified that preliminary investigations revealed that Porter had "suffered from two . . . gunshot wounds to the back of the head." Detective Magee also stated that Porter's "underwear was torn[, and] . . . it appeared that he had been pulled on."

¶9.    Detective Magee stated that he went to Porter's home on April 29, 2016, and spoke

5

to Porter's mother, Camille Porter (Camille), who said she saw "a black male in a black . . . Dodge Charger picker her son up that morning." Detective Magee showed Camille a photo lineup, and she identified McLaughlin as the man who had picked up Porter on April 29, 2016.

¶10. Detective Magee stated, "Mr. McLaughlin was developed as a suspect through Mr. Zamarious Harden." Harden wrote a Facebook post saying, "[I]t was messed up what Mack did to my boy KJ." Detective Magee testified that Harden gave a statement to police, and Harden said that McLaughlin asked him if he knew Porter. Harden responded, "I know him well. If you want to rob him just don't kill him." Detective Magee stated that McLaughlin, Brown, Harden, and Rose also discussed robbing Porter on April 29, 2016, while Porter was in the bank withdrawing money.[4]

¶11. Detective Magee testified that the black Dodge Charger was found the night of April 29, 2016, "burned beyond recognition." Detective Magee stated that McLaughlin was the only one suspected of burning the vehicle because the other individuals involved in Porter's murder said that McLaughlin told them he would burn it. Detective Magee testified that in Rose's statement to police, Rose said, "I learned that [McLaughlin] was going to clean the vehicle and from the understanding he was going to burn the vehicle."

¶12. Detective Magee testified that he received information that McLaughlin was at the Mustang Hotel in a green Ford Explorer. Police officers arrived and found McLaughlin

---

[4] During Detective Magee's testimony, there was no objection raised to his repeating what was told to him during his investigation.

6

wearing the "clothing . . . [in] which he committed this crime."[5] A "white and black T-shirt with stars on it" was also recovered from the back of the Ford Explorer.[6] Further, Detective Magee testified that "the shirt that [McLaughlin] had on that was recovered from the green Ford Explorer on the day of his apprehension . . . came back to be positive to have [Porter's] DNA, which was blood, on it."

¶13. On cross-examination, Detective Magee agreed that he had no personal knowledge about "the time line and what occurred in the car and who said what . . . ." Additionally, Detective Magee testified that McLaughlin was suspected of burning the Dodge Charger because he was the last person seen with the vehicle, and "[b]ased on corroborating evidence that he said he was going to clean the vehicle, a crime has been committed in that vehicle . . . . He wanted to get rid of the vehicle. What other way was he going to deal with the vehicle so he burned the vehicle."[7]

¶14. The State's next witness was Velma Hunter, Porter's neighbor. Hunter testified that on April 28, 2016, she saw Porter looking at a Dodge Charger, but he did not buy it. She testified that Porter spoke with her about purchasing the Dodge Charger, and she told him not to buy it. Hunter stated that the night of April 28, 2016, was the last time she saw Porter. She testified that she saw two other individuals standing with Porter while he looked at the

---

[5] Detective Magee stated that he knew the clothing was the same because of video surveillance footage taken at a food mart on the day before Porter was murdered. In the video, McLaughlin can be seen wearing a white shirt and brown boots while standing on top of the black Dodge Charger.

[6] This shirt was the one McLaughlin wore when Porter was robbed and killed.

[7] This answer was in response to a question defense counsel asked.

7

Dodge Charger, but she was not able to "make out a face."

¶15. The victim's mother, Camille Porter, testified next. Camille said Porter had been receiving disability checks for a leg condition since 2007 or 2008. Camille testified that Porter stayed home all day on April 28, 2016. Camille stated that on the morning of April 29, 2016, Porter woke up before his other siblings, which was unusual, and began pacing around the home. She asked him, "[W]hat's wrong," but he never gave her an answer. Camille testified that at "a quarter to eight" Porter received a phone call, and she "looked out the door, and . . . said, 'oh, somebody in a black car driving.'" Camille asked Porter who was driving, but he never told her. Camille testified that she watched from the window while a black vehicle arrived. She stated that she saw the driver get out of the vehicle and put something in the trunk while Porter was getting ready to leave. At a "quarter to nine" an officer came to her home and told her about Porter's death. Camille testified that she was shown a photo lineup and asked to identify which man came to her house on April 29, 2016. Camille selected McLaughlin. The photo lineup, with McLaughlin circled as the man who picked up Porter, was admitted into evidence. The State asked Camille, "Do you see the individual who picked up [Porter] that morning in the courtroom?" Camille responded "yes" and pointed to McLaughlin.

¶16. The State's next witness was Zamarious Harden, who testified that on April 28, 2016, he got into a black Dodge Charger with McLaughlin and Brown. McLaughlin asked Harden if he knew anyone who wanted to buy his car, and Harden mentioned Porter. That evening, McLaughlin, Harden, Brown, and Rose went to Porter's house to show Porter the car.

8

McLaughlin got out of the car, and Porter input the "numbers off the back of the tag to the car into his phone to see if the car was stolen." Harden testified that after they left Porter's home, McLaughlin asked Harden, "[H]ow well do [you] know [Porter]?" Harden testified, "I was like I know him pretty good . . . . I was telling him I know him pretty [good] so he was just supposed to rob [Porter]."

¶17.    Harden stated that he went back to Porter's house on the morning of April 29, 2016, with McLaughlin, Brown, and Rose. Harden testified that before they arrived at Porter's home, McLaughlin said he was "just going to get the money. [H]e was not going to give [Porter] the car." Harden testified that everyone in the car at that time heard McLaughlin say this. When they left Porter's house, Porter sat in the front passenger seat. McLaughlin was driving, Harden was behind Porter, Brown was in the middle, and Rose was behind McLaughlin. Harden testified that they went to the bank first. Then, they went to the library "to make sure the paperwork was all good for the car store," but the library was closed. Harden testified that they were "supposed to be going to get food . . . when [McLaughlin] turned down the dead end road." Harden testified that McLaughlin turned the car around, and as they "were going back up, that's when the . . . gunshots was fired."

¶18.    Harden testified that Brown had a gun that she got from Rose. Harden stated that Brown asked Porter for the money and then shot him two times. After Brown shot Porter, McLaughlin "reached over there and got the money and the gun out of [Porter's] pocket." Harden stated that he, McLaughlin, and Rose "pushed" Porter out of the vehicle. Then, McLaughlin dropped Harden, Rose, and Brown off at Harden's and Rose's house, where

9

they changed their clothes and washed their hands with bleach. On the way to Harden's home, McLaughlin divided the money among the passengers, giving each $100.00 and keeping the rest for himself. Harden testified that he never saw McLaughlin again until he was arrested.

¶19. Harden testified that he was shown two photo lineups.[8] In the first lineup, Harden selected a picture of Brown and labeled her as the person who shot Porter. In the second lineup, Harden selected McLaughlin and labeled him as the individual who "took [the] money and gun." Harden also identified McLaughlin in the courtroom as the individual who took the money and gun from Porter.

¶20. On cross-examination, Harden agreed that there was never a plan to shoot or kill Porter. Harden stated, "I just told him if you do something don't kill him, don't harm him, you can rob him." Harden admitted that McLaughlin never said the words "I'm going to rob," but he did say something similar "in so many words." Harden testified that McLaughlin said, "I'm just going to get the money from him. He not going to get this car. We're just going to rob him." Harden stated that there was no struggle between Porter and McLaughlin for the money: "[a]s soon as [Porter] got shot, [McLaughlin] just went in the pocket and got the money."

¶21. The State's next witness was Dr. Mark LeVaughn (Dr. LeVaughn), who at the time was the chief medical examiner for the State. Dr. LeVaughn testified that the cause of death in this case was multiple gunshot wounds, and the manner of death was homicide. Dr.

---

[8] Both photo lineups were admitted into evidence.

LeVaughn testified that Porter suffered "two gunshot wounds to the back of the neck," both "contact wounds."[9] During Dr. LeVaughn's testimony, the State moved to admit a picture of Porter's brain, which had been removed from his skull and was sitting on the autopsy table. The defense objected, arguing that the photograph was "highly prejudicial and not probative." The State argued that this photo showed the "actual bullet pathway and it shows the injury that occurs and why someone dies from a bullet wound" like the one Porter suffered. The State also argued that the jury needed to see the picture for Dr. LeVaughn to be able to explain the injuries to Porter. The trial court admitted the photograph as Exhibit S-11. On cross-examination, Dr. LeVaughn stated that the "shooter was in the rear or behind the victim."

¶22. The State's next witness was Shaneka Brown, who stated that on April 28, 2016, she went to Porter's house with McLaughlin, Harden, and Rose to sell the black Dodge Charger. Brown stated that McLaughlin and Harden got out of the vehicle when they arrived at Porter's house. Brown testified that she, McLaughlin, Harden, and Rose left Porter's home that evening, and McLaughlin asked Harden, "Do you know [Porter] real well?" Brown testified that Harden responded and said, "[Y]es . . . then he was like you can rob him but just don't kill him." The State asked why Harden would give McLaughlin that kind of response, and Brown answered, "Because [McLaughlin] asked him did he know [Porter] real well. He was planning to do something to [Porter]."

¶23. Brown testified that on the morning of April 29, 2016, she rode to Porter's house with

---

[9] Dr. LeVaughn defined "contact wound" as when "the barrel of the gun was in contact with the skin when it discharged."

McLaughlin, Rose, and Harden. Brown testified that while they were riding in the car, McLaughlin said "he going to keep the car and the money." The State asked, "By him saying that, what did he mean to everybody in the car?" Brown answered, "That he was going to rob [Porter]." After they picked up Porter, they went to the bank for Porter to withdraw money and to the library for Porter to check if the car was stolen. Brown stated that the library was closed, so McLaughlin drove to a dead end. Brown testified that Harden was "acting like" he was making a call to get money for food, and Porter offered to pay for everyone's food. After this, McLaughlin turned the car around and started driving up the road. Brown testified that once McLaughlin turned around "the gun was passed from [Rose] to me, then I passed it to [Harden], and he passed it back to me, and he was like do it, rob, and that's when I put the [gun] up" to the back of Porter's head. Brown stated that when she did this, Porter "upped" his own gun, and McLaughlin and Porter began "struggling over the gun." Brown said that "all of a sudden the gun went off in my hand . . . . Twice."

¶24. Brown stated that after she shot Porter, she jumped out of the car in a panic, and McLaughlin got out of the car and started "pulling" Porter out of the car with the help of Rose. Brown stated that McLaughlin "went into [Porter's] pocket" and took his money after they pulled Porter out of the car. Brown testified that she expected to receive a portion of the money taken from Porter. Brown stated that McLaughlin took $700.00 from Porter. He gave her, Harden, and Rose $100.00 each and kept the rest for himself. Brown said after the shooting, McLaughlin dropped her, Harden, and Rose off at Harden's and Rose's house, where they used bleach to wash the "gun residue off."

¶25.    On cross-examination, Brown testified that there was a struggle in the car between Porter and McLaughlin when she shot the gun, so the muzzle of the gun was "near" Porter's head. Brown testified that the "plan" everyone discussed included McLaughlin robbing Porter. Brown stated that McLaughlin did not know that Brown or Rose had a gun on the day of the shooting. Brown also testified that McLaughlin took the gun from Porter's hand and the money from Porter's pocket after he had been shot.

¶26.    The State's next witness was Investigator Robert Watts (Investigator Watts), who testified that he received a call at 9:31 a.m. "in reference to a homicide." Investigator Watts stated that when he arrived, he "observed [that] the [victim] had expired due to his injuries[,] . . . and he was face down in the middle of Noble Street." He described Porter's body as he found it on April 29, 2016: "His clothing was torn . . . . His pants were partially pulled down, his boxers were torn, as if someone had pulled him or pulled his clothing. He was face down. There [were] abrasions on his face where it appeared he hit the concrete." Investigator Watts also stated that Porter's left pocket was "out as if someone took something out of his pocket." Investigator Watts stated that he was also called at 10:49 p.m. to respond to a burned Dodge Charger on April 29, 2016. He returned to the scene on May 2, 2016, to take photos and investigate the scene during the day. Investigator Watts stated that he was unable to collect evidence from the vehicle because it was "charred completely." Investigator Watts also searched the green Ford Explorer McLaughlin had been arrested in and recovered a "white shirt with black stripes" from the backseat of the vehicle. He also found a "silver Jimenez JA-22lr handgun."

¶27. The State's next witness was Jacob Burchfield (Burchfield), a forensic scientist at the Mississippi Forensics Laboratory. Burchfield testified about the gunshot-residue analysis he performed regarding McLaughlin. Burchfield stated that the results of the testing showed "[a] particle indicative of gunshot residue was observed to be present on the . . . right palm."[10] On cross-examination, Burchfield agreed that "[h]aving a particle indicative does not conclusively mean you had gunshot residue on your hand[.]"

¶28. After Burchfield testified, the State called Alexandria Bradley (Bradley), a DNA technical leader and bioscience section supervisor at the Mississippi Forensics Laboratory. Bradley testified that she received multiple samples for DNA extraction "to compare and determine the source of those items." One sample was the t-shirt found in the vehicle McLaughlin was arrested in the day after the shooting. A food mart's surveillance video showed McLaughlin wearing this shirt the day before Porter was murdered. Bradley testified that the blood on the shirt was consistent with Porter's DNA profile. After Bradley's testimony, the State rested.

¶29. Rose was the defense's only witness. Rose testified that on the morning of April 29, 2016, he rode with McLaughlin, Harden, and Brown to Porter's house. Rose stated that McLaughlin was driving a black Dodge Charger. Rose testified that once he was picked up, they drove around, but he kept falling asleep because he "had stayed up three nights" with his children. Rose testified that he did not know of any plan or any discussion of a plan to

---

[10] Burchfield stated that "indicative" means that it is "possible" the right palm was "in an environment where a gun was fired." Burchfield explained that the particles could only come from "two other areas[:] . . . European brake dust and also in the propellants that make up fireworks . . . ."

14

rob Porter, nor did he have a plan with McLaughlin to rob Porter. Rose stated that Brown had a firearm "between her lap." Rose testified that after Brown shot Porter, she pointed the gun at him and ordered him to "kick [Porter] out [of] the car." Rose stated that he was unsure if there was a struggle between Porter and McLaughlin before Porter was shot because he was asleep until the gun was pointed at Porter's head: "I woke up to the gun at his head so I don't know" if there was a struggle. Rose stated that McLaughlin never gave him any money. Instead, Brown gave him some of the money that Porter had.

¶30.     On cross-examination Rose said the only reason he was in the Dodge Charger was because he "wanted to go home." Rose stated that he was asleep when they went to the bank, but he was awake when they went to the library. He stated that he woke up at the dead-end road because he heard Brown telling Porter to "give it up" while holding a "revolver" in her hand. Rose testified that McLaughlin "reached in [Porter's] pocket" after Brown shot Porter and got an envelope with money in it. Rose stated that McLaughlin put the money in his pocket and "jumped out the car." Rose testified that McLaughlin gave the money to Brown after she "upped the gun on him." Rose stated that he gave Brown and Harden bleach to "get the blood off their hands."

¶31.     The jury convicted McLaughlin of all four counts–capital murder, third-degree arson, conspiracy, and possession of a firearm by a convicted felon. McLaughlin was sentenced to serve life in prison for the murder of Porter. McLaughlin was also sentenced to serve three years for third-degree arson, five years for conspiracy, and ten years for being a felon in possession of a firearm. These sentences were ordered to run concurrently with one another.

15

McLaughlin filed a motion for a new trial or JNOV. The circuit court granted in part and denied in part McLaughlin's motion for a new trial or JNOV. The court found that "as to the charged of Capital Murder, Arson, and Conspiracy, . . . McLaughlin's motion is not well-taken and should be denied." However, the court found that the conviction for felon in possession of a firearm should be set aside. The State of Mississippi stated on the record that it had "no objection to setting aside that charge." McLaughlin appealed.

¶32. McLaughlin raises six issues on appeal: (1) the evidence was insufficient to support the conviction of capital murder; (2) the evidence was insufficient to support the conviction of third-degree arson; (3) the evidence was insufficient to support the conviction of conspiracy; (4) the State violated McLaughlin's right to remain silent when it asked Detective Magee about McLaughlin's decision not to provide a statement to police; (5) the trial court erred in admitting Exhibit S-11; and (6) the retroactive misjoinder of McLaughlin's conviction of being a felon in possession of a firearm entitles him to a new trial.

**ANALYSIS**

I.      **The evidence was sufficient to support a conviction of capital murder.**

¶33. Rulings on the sufficiency of the evidence claims are reviewed de novo. *Turner v. State*, 291 So. 3d 376, 383 (¶20) (Miss. Ct. App. 2020). When a challenge to the sufficiency of the evidence is being reviewed, the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018) (quoting *Hearn v. State*, 3 So. 3d 722, 740

16

(¶54) (Miss. 2008)). The evidence is viewed in a light most favorable to the State, and the State is given all favorable inferences that can be reasonably drawn from the evidence. *Williams v. State*, 285 So. 3d 156, 159 (¶11) (Miss. 2019). If the court finds that "any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand." *Smith v. State*, 250 So. 3d 421, 424 (¶12) (Miss. 2018) (quoting *Cowart v. State*, 178 So. 3d 651, 666 (¶41) (Miss. 2015)).

¶34. McLaughlin was found guilty of capital murder pursuant Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 2015), which states, "The killing of a human being without the authority of law by any means or in any manner shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . or in any attempt to commit such felonies." McLaughlin argued the State failed to provide sufficient evidence to prove he had the required mental state to kill or rob Porter. Specifically, McLaughlin argued that under an accomplice-liability theory, "the State was required to prove beyond a reasonable doubt that . . . McLaughlin personally possessed the required mens rea—i.e. a 'community of intent' to kill or rob Porter by taking his money through force or putting in fear of immediate injury, regardless of whether Brown, Harden and/or Rose independently formed that intent or acted with an intent to rob Porter."

¶35. The Mississippi Supreme Court has held that to establish accomplice liability, the State must show the defendant was "present, consenting, aiding, and abetting such person in the commission of the crime charged." *King v. State*, 47 So. 3d 658, 663 (¶12) (Miss. 2010)

17

(quoting *Brooks v. State*, 763 So. 2d 859, 861 (¶3) (Miss. 2000)).  A "person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender."  *Sneed v. State*, 31 So. 3d 33, 41 (¶24) (Miss. Ct. App. 2009) (quoting *Jones v. State*, 710 So. 2d 870, 874 (¶15) (Miss. 1998)).  Additionally, if two or more individuals enter into an agreement to commit a crime, the actions done by one individual become the actions of all individuals.  *Scarborough v. State*, 956 So. 2d 382, 386 (¶21) (Miss. Ct. App. 2007).

¶36.  Here, the crime charged was capital murder under section 97-3-19(2)(e), which requires proof of an unlawful killing of a person while engaged in the commission of another specified felony in the statute.  The State did not have to prove that McLaughlin killed Porter to convict McLaughlin of capital murder.  Instead, the State had to prove that Porter was killed while McLaughlin was "engaged in the commission" of robbing Porter.  *See Booker v. State*, 303 So. 3d 1133, 1138 (¶18) (Miss. Ct. App. 2020) ("[U]nlike other sections of the capital murder statute, [s]ubsection 2(e) does not require the prosecution to prove the elements of murder, only that the killing took place while the accused was 'engaged in the commission' of the enumerated felonies.") (quoting *Layne v. State*, 542 So. 2d 237, 243 (Miss. 1989)).  The elements of armed robbery are "(1) a felonious taking or attempt to take; (2) from the person or from the presence; (3) the personal property of another; (4) against his will; (5) by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon."  *Brown v. State*, 235 So. 3d 1399, 1403

(¶14) (Miss. 2017) (quoting *Lenoir v. State*, 224 So. 3d 85, 91 (¶19) (Miss. 2017)); *see also* Miss. Code Ann. § 97-3-79 (Rev. 2014) ("Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery. . . .").

¶37. The State proved the elements of armed robbery through an accomplice-liability theory by alleging and proving a plan to rob Porter. *See infra* Part III. Further, the State showed that there was a felonious taking from Porter's person of his personal property. Mississippi law defines "engaged in the commission of" as "one continuous transaction." *See Simmons v. State*, 805 So. 2d 452, 477 (¶43) (Miss. 2001) ("An indictment charging a killing occurring 'while engaged in the commission of' one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony.") (quoting *West v. State*, 553 So. 2d 8, 13 (Miss. 1989)). Brown, Harden, and Rose testified that once Porter was shot, McLaughlin grabbed the money from Porter's pocket either before or after leaving his body in the middle of the road. Detective Magee testified that he noticed Porter's "front left pocket had been turned inside out." Detective Magee also testified that he learned through Rose and Harden's statements to law enforcement that McLaughlin "took the envelope containing money" from Porter's pocket. Investigator Watts confirmed that Porter's "left pocket . . . [was] out as if someone took something out of his pocket."

¶38. The State also showed that this taking was against Porter's will "by violence to his

19

person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon" and that Porter was killed. *See Brown*, 235 So. 3d at 1403 (¶14). Brown testified that in the presence of McLaughlin and others, she pointed the gun at the back of Porter's head and demanded he give her the money. Harden testified that Brown pointed a gun at Porter's head and demanded he hand over his money. Brown, Harden, and Rose testified that Brown shot Porter twice in the back of the head. All three testified that after Porter had been shot, McLaughlin took the money out of Porter's pocket. Further, McLaughlin asked Harden about Porter and was told "just rob him" and not to "kill him" and McLaughlin told everyone that he was only getting the money from porter and not giving him the vehicle.

¶39. Additionally, Camille identified McLaughlin in a photo lineup and in court as the man who picked up her son on April 29, 2016, in the black Dodge Charger. McLaughlin was driving the vehicle the armed robbery took place in and drove to a dead-end street out of public view. McLaughlin did not drive to the secluded area to sell the vehicle to Porter. He spoke to others about the robbery prior to picking up Porter, and those individuals testified about their conversations. McLaughlin picked up Porter, drove him to the bank to obtain money for the purchase of the vehicle, and then eventually drove to a secluded location. The sale of a vehicle does not require seclusion. McLaughlin was not shocked at Brown's action at that secluded location as the first thing he did after Porter was shot was grab the money from Porter. Additionally, when Brown was asked why McLaughlin drove down a dead-end road, she responded under oath, "To rob the victim." Based on the evidence presented by the

20

State a rational juror could find that McLaughlin was "present, consenting, aiding, and abetting" in the armed robbery of Porter. *See King*, 47 So. 3d at 663 (¶12).

¶40. In summary, the State was required to prove that McLaughlin engaged in part of a plan to commit armed robbery and that Porter was killed during the commission of that crime. The State did not have to prove that McLaughlin killed Porter or intended to kill Porter. *See Layne*, 542 So. 2d at 243. Brown and Harden testified about a plan to rob Porter. Rose testified that he did not hear anyone discuss a plan to rob Porter. When a jury is presented with conflicting evidence, it is up to the jury to weigh conflicting testimony and determine the worth of it. *Howell v. State*, 860 So. 2d 704, 731 (¶92) (Miss. 2003). The jury has the responsibility to "listen to the evidence, observe the demeanor of the witnesses, and decide the issue of the credibility of the witnesses and what weight to give to any particular piece of evidence." *Johnson v. State*, 311 So. 3d 1161, 1181 (¶46) (Miss. Ct. App. 2020) (quoting *Brown v. State*, 764 So. 2d 463, 467 (¶9) (Miss. Ct. App. 2000)). Here, the jury heard the testimony from Harden, Brown, Detective Magee, and Rose, and convicted McLaughlin of capital murder. Considering the evidence presented in a light most favorable to the State, we determine that there was sufficient evidence for a jury to determine that all essential elements of capital murder were met.

## II. The evidence was sufficient to support a conviction of third-degree arson.

¶41. As stated above, when a reviewing a sufficiency of the evidence claim, this court views the evidence in a light most favorable to the State, and the State is given all favorable inferences that can be reasonably drawn from the evidence. *Williams*, 285 So. 3d at 159

21

(¶11). This Court determines if "any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Id*. Even when only circumstantial evidence is presented to prove guilt, the State's burden remains the same: to prove the defendant's guilt beyond a reasonable doubt. *Nevels v. State*, 325 So. 3d 627, 631 (¶12) (Miss. 2021) ("[T]here is no higher criminal standard of *beyond* beyond a reasonable doubt.").

¶42. McLaughlin was convicted of third-degree arson pursuant to Mississippi Code Annotated section 97-17-7 (Rev. 2014). That section states that "[a]ny person who wilfully and maliciously sets fire to or burns or causes to be burned, or who aids, counsels or procures the burning of any personal property of whatsoever class or character . . . shall be guilty of arson in the third degree . . . ." Miss. Code Ann. § 97-17-7. McLaughlin argues that the State failed to provide sufficient evidence to prove that he burned or assisted in burning the black Dodge Charger.

¶43. The State presented evidence that could lead a rational juror to find the essential elements of third-degree arson had been proved beyond a reasonable doubt. *See Williams*, 285 So. 3d at 159 (¶11). Brown, Harden, and Rose testified that McLaughlin was driving the black dodge Charger on April 28 and 29, 2016. They all testified that McLaughlin was trying to sell the black Dodge Charger to Porter and that Porter was shot in the head in that vehicle. They also testified that after Porter was killed, McLaughlin dropped them off at Harden's and Rose's house before driving away in the black Dodge Charger. Harden stated that McLaughlin dropped them off and then "sped off." Brown testified that she spoke to McLaughlin after she cleaned her hands, and he told her, "He got to get rid of the car . . . ."

Brown stated that based on his statement, she believed McLaughlin was going to burn the car.[11]

¶44. Detective Magee testified that McLaughlin was seen on security-camera footage from a food mart standing on the hood of the black Dodge Charger on April 28, 2016, the day before Porter was killed. Detective Magee testified that McLaughlin was the last person seen with the black Dodge Charger. Detective Magee stated that his interviews with Brown, Harden, and Rose led him to believe that McLaughlin "was in possession of the . . . Dodge Charger even after . . . Porter was killed." Detective Magee stated that Rose specifically told him, "I learned that [McLaughlin] was going to clean the vehicle and from the understanding he was going to burn the vehicle." Camille, Porter's mother, also identified McLaughlin in a photo lineup as the driver of the black Dodge Charger who picked her son up on the morning of April 29, 2016.

¶45. The State presented testimony from four witnesses, Brown, Harden, Detective Magee, and Camille, to show McLaughlin was in possession of the black Dodge Charger on the day Porter was murdered. The defense's witness Rose also confirmed that McLaughlin was driving the black Dodge Charger on the day of Porter's death. McLaughlin was the last person known to possess the car before it was found "charred completely" and "burned beyond recognition," and McLaughlin had motive to burn the vehicle because the murder had occurred in the vehicle. The evidence presented by the State was purely circumstantial. *See Turner*, 291 So. 3d at 381 (¶13) (defining circumstantial evidence as "evidence which,

---

[11] Brown stated that McLaughlin never told Brown he was going to burn the car, only that he was going to "get rid of it."

without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist.") (quoting *Shelton v. State*, 214 So. 3d 250, 258 (¶40) (Miss. 2017)). The Mississippi Supreme Court has held that in all criminal cases, regardless of what type of evidence is presented, there is "one burden of proof–guilt beyond a reasonable doubt." *Nevels*, 325 So. 3d at 631 (¶12). Considering the evidence in a light most favorable to the State, this Court finds that a reasonable juror could have found that the State proved the essential elements of third-degree arson beyond a reasonable doubt. *See Williams*, 285 So. 3d at 159 (¶11).

### III. The evidence was sufficient to support a conviction of conspiracy.

¶46. As stated previously, in a sufficiency of the evidence claim, the court must determine if any rational juror could have determined the essential elements of the crime were proved beyond a reasonable doubt. *Williams*, 285 So. 3d at 159 (¶11). The State is given all favorable inferences, and the evidence is viewed in a light most favorable to the State. *Id*. McLaughlin was convicted of conspiracy to commit armed robbery pursuant to Mississippi Code Annotated section 97-1-1(1)(a) (Rev. 2014), which states that it is a crime if two or more people conspire together to commit a crime. The Mississippi Supreme Court has stated, "The only element of conspiracy to commit armed robbery is two or more persons agreeing to commit armed robbery." *Lenoir*, 224 So. 3d at 91 (¶19). Recently, the Mississippi Supreme Court has recognized unilateral conspiracy. *Henderson v. State*, 323 So. 3d 1020, 1024 (¶16) (Miss. 2021). Therefore, an agreement to commit the crime is enough to establish the completed crime of conspiracy, regardless if the agreement is with a law enforcement

24

officer or another individual. *Id*. at (¶17); *Thomas v. State*, 180 So. 3d 756, 762 (¶19) (Miss. Ct. App. 2015). No formal agreement to commit a crime is required; instead, a "jury may infer a conspiracy from the circumstances, 'particularly by declarations, acts, and conduct of the alleged conspirators.'" *Id*. (quoting *Young v. State*, 910 So. 2d 26, 29 (¶11) (Miss. Ct. App. 2005)). "Once the existence of a conspiracy is shown, only slight evidence is required to connect a particular defendant with the conspiracy." *Stokes v. State*, 141 So. 3d 421, 428-29 (¶31) (Miss. Ct. App. 2013) (quoting *Morgan v. State*, 741 So. 2d 246, 255 (¶27) (Miss. 1999)).

¶47. McLaughlin argues the State did not present sufficient evidence to convict him of conspiracy. We disagree. Detective Magee testified that Brown, Harden, Rose, and McLaughlin also discussed robbing Porter on April 29, 2016, while Porter was getting money from the bank. Harden testified that after Porter looked at the black Dodge Charger on April 28, 2016, McLaughlin asked Harden how well he knew Porter. Harden responded, "Don't harm [Porter], just get the money, if you going to rob him just do that and that's it." Harden testified that on April 29, 2016, McLaughlin said he was "just going to get the money," and he "was not going to give [Porter] the car." Harden also testified that there was a plan to rob Porter: "It was just supposed to be that they was supposed to rob him and get the money and that's it." Brown testified that Harden told McLaughlin, "[Y]ou can rob [Porter] but just don't kill him." Brown also testified that on April 29, 2016, McLaughlin told her, Harden, and Rose that he was "going to keep the car and the money" while they rode to Porter's home. Brown stated that she interpreted what McLaughlin said to mean "he was going to

25

rob [Porter]." The State also asked Brown why McLaughlin drove down the dead-end road where Porter was ultimately killed, and Brown said, "To rob the victim." However, Rose denied ever hearing a conversation about robbing Porter because Rose was asleep.

¶48. The jury is the ultimate trier of fact, so it must "listen to the evidence, observe the demeanor of the witnesses, and decide the issue of the credibility of the witnesses and what weight to give to any particular piece of evidence." *Johnson*, 311 So. 3d at 1181 (¶46) (quoting *Brown*, 764 So. 2d at 467 (¶9)). Here, the jury heard Detective Magee, Harden, and Brown testify that there was a plan to rob Porter. The jury could "infer" from the "declarations, acts, and conduct" of McLaughlin, Harden, Brown, and Rose that there was a conspiracy to rob Porter. *See Thomas*, 180 So. 3d at 762 (¶19). The jury listened to testimony from all the witnesses, observed each witness's demeanor, determined each witness's credibility, and weighed the evidence, and the jury found McLaughlin guilty of conspiracy. *See Johnson*, 311 So. 3d at 1181 (¶46). Considering the evidence in a light most favorable to the State, this Court finds that there was sufficient evidence that would lead a jury to find the essential elements of conspiracy proved beyond a reasonable doubt.

### IV. The State violated McLaughlin's right to remain silent, but it was not plain error.

¶49. McLaughlin argues his Fifth Amendment right to remain silent was violated when the prosecutor questioned Detective Magee about McLaughlin's post-*Miranda* silence. The following questions by the State and answers by the witness are at issue:

Q. And was he arrested at that time?

A. Yes, he was.

26

Q.    And at some point is was taken into custody?

A.    Yes, he was.

Q.    Was he Mirandised?

A.    Yes, he was.

Q.    Was he questioned?

A.    No, he was . . . I attempted to, yes, I attempted to.

Q.    You attempted to?

A.    I attempted to interview him, yes.

**Q.    Did he give a statement?**

**A.    No, he did not.**

(Emphasis added). McLaughlin's attorney did not object to this line of questioning, and he did not move for a mistrial.

¶50.    Usually when this Court reviews a challenge to comments made at trial about a defendant's post-*Miranda* silence, this Court is presented with a trial court's denial of a motion for mistrial, which is reviewed for abuse of discretion. *Stone v. State*, 320 So. 3d 1246, 1250 (¶18) (Miss. Ct. App. 2021); *see also Smith v. State*, 90 So. 3d 122, 126 (¶8) (Miss. Ct. App. 2012) ("When reviewing challenges to comments on post-*Miranda* silence, we are generally faced with a trial court's denial of a motion for a mistrial, which we review for abuse of discretion."). However, McLaughlin's counsel failed to object or make a motion for a mistrial when the prosecutor asked Detective Magee about McLaughlin's decision not to give a statement, and Detective Magee commented on McLaughlin's post-*Miranda*

27

silence.  Therefore, this issue is procedurally barred from being raised on appeal.  *See Jenkins v. State*, 284 So. 3d 862, 871 (¶17) (Miss. Ct. App. 2019) (noting that the failure to make a contemporaneous objection the error is waived on appeal); *Kirk v. State*, 160 So. 3d 685, 692 (¶17) (Miss. 2015) ("Generally, preservation of an issue for appeal requires a contemporaneous objection at trial.") (citing *Christmas v. State*, 10 So. 3d 413, 421 (¶36) (Miss. 2009)).

¶51.    Although McLaughlin's issue on appeal is procedurally barred, this Court may rely on plain-error review to correct "obvious instances of injustice or misapplied law."[12] *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016).  "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Hall v. State*, 201 So. 3d 424, 428 (¶12) (Miss. 2016).  "To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether that error has prejudiced the outcome of the trial." *Swinney v. State*, 241 So. 3d 599, 606 (¶15) (Miss. 2018) (quoting *Conner v. State*, 138 So. 3d 143, 151 (¶19) (Miss. 2014)).  To note, "[p]rejudice is often lacking when the weight of the evidence against a defendant is overwhelming." *Id*. (quoting *Hall*, 201 So. 3d at 428 (¶12)).

¶52.    The United States Supreme Court, the Mississippi Supreme Court, and this Court all recognize the legal rule that an accused "has the right to remain silent, guaranteed by the Fifth Amendment to the United States Constitution." *Swinney*, 241 So. 3d at 608 (¶29)

---

[12] Because counsel failed to object, this Court will not apply a harmless-error analysis.

(quoting *Austin v. State*, 384 So. 2d 600, 601 (Miss. 1980)); *see also Miranda v. Arizona*, 384 U.S. 436, 467-69 (1966) ("At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent."); *Johnson v. State*, 288 So. 3d 342, 348 (¶21) (Miss. Ct. App. 2019) (stating that the Fifth Amendment to the United States Constitution guarantees an accused the right to remain silent); U.S. Const. Amend. V ("No person shall be . . . compelled in any criminal case to be a witness against himself . . . .").

¶53. Further, the United States Supreme Court has established that prosecutors cannot comment on a person's assertion of his right to remain silent after he has been made aware of that right during custodial interrogations. *See United States v. Hale*, 422 U.S. 171, 180 (1975) ("Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice."); *Doyle v. Ohio*, 426 U.S. 610, 618 (1976) ("[W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."); *Griffin v. California*, 380 U.S. 609, 615 (1965) ("[T]he Fifth Amendment, in its direct application to the Federal Government and in its bearing on the State by reason of the Fourteenth Amendment, forbids . . . comment by the prosecution on the accused's silence . . . .").

¶54. The Mississippi Supreme Court and this Court have also held that prosecutors cannot

29

comment on a defendant's decision to assert his constitutional right to remain silent. *See Walker v. State*, 299 So. 3d 759, 766 (¶22) (Miss. 2020) (stating it is "improper and, ordinarily, reversible error to comment on the accused's post-*Miranda* silence" because the accused's right to remain silent is "equally as strong as the right not to testify and it is error to comment on either"); *Swinney*, 241 So. 3d at 608 (¶29) ("It is improper and, ordinarily, reversible error to comment on the accused's post-*Miranda* silence."); *Gunn v. State*, 56 So. 3d 568, 571 (¶15) (Miss. 2011) (noting that it is "improper and, ordinarily, reversible error to comment on the accused's post-*Miranda* silence"); *Gilbert v. State*, 48 So. 3d 516, 522 (¶22) (Miss. 2010) (holding it is "improper and ordinarily, reversible error to comment on the accused's post-*Miranda* silence.") (quoting *Emery v. State*, 869 So. 2d 405, 408 (Miss. 2004))); *Quick v. State*, 569 So. 2d 1197, 1199 (Miss. 1990) ("It is improper and, ordinarily, reversible error to comment on the accused's post-Miranda silence. The accused's right to be silent then is equally as strong as the right not to testify and it is error to comment on either. Certainly it is improper to inquire of the defendant as to whether he made any protest or explanation to the arresting officers."); *Martin v. State*, 266 So. 3d 652, 669 (¶40) (Miss. Ct. App. 2018) (stating a comment on an accused's post-*Miranda* silence is ordinarily "improper" and "reversible"). There is little doubt that a person has a right to remain silent during custodial interrogations after he has been informed of his rights and invoked them, and the State cannot comment on the assertion of that right in front of a jury trying the defendant on the crime for which he was arrested.

¶55. Next, under a plain-error analysis, this Court must determine if the error caused by

deviation from a legal rule was clear, plain, and obvious. It certainly appears from the transcript that the prosecutor in McLaughlin's trial intentionally elicited Detective Magee's testimony about McLaughlin's decision to exercise his right to remain silent. It is bewildering to this Court that such questions would be intentionally asked under the weight of so many unambiguous pronouncements by the United States Supreme Court, the Mississippi Supreme Court, and this Court. *See Hale*, 422 U.S. at 180; *Doyle*, 426 U.S. at 618; *Griffin*, 380 U.S. at 615; *Gilbert*, 48 So. 3d at 522 (¶22) (quoting *Emery*, 869 So. 2d at 408); *see also Walker*, 299 So. 3d at 764 (¶18); *Robinson v. State*, 247 So. 3d 1212, 1226 (¶28) (Miss. 2018); *Martin*, 266 So. 3d at 669 (¶40). Therefore, we find that it was a violation of a well-known legal rule and that the error was plain, clear, and obvious when the prosecutor intentionally asked questions to elicit information about McLaughlin's constitutional right to remain silent after arrest.

¶56. The Mississippi Supreme Court has instructed that when presented with an issue like the one presented here, prejudice is a lynchpin in the plain-error analysis. *See Swinney*, 241 So. 3d at 606 (¶15); *Cox v. State*, 793 So. 2d 591, 599 (¶34) (Miss. 2001) (stating that to constitute plain error the trial court must "deviate[] from a legal rule, the error must be plain, clear or obvious, **and** the **error must have prejudiced** the outcome of the trial") (emphasis added)). Further, the supreme court has instructed that prejudice exists when the error creates a "manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Hall*, 201 So. 3d at 428 (¶12). However, prejudice will not be found when the State presents an overwhelming amount of evidence against the

31

accused. *See Swinney*, 241 So. 3d at 606 (¶15) (quoting *Hall*, 201 So. 3d at 428 (¶12)); *see also Stevenson v. State*, 320 So. 3d 1225, 1230 (¶19) (Miss. 2021) (stating that "[p]rejudice often is lacking when the weight of the evidence against a defendant is overwhelming").

¶57.    In *Hall v. State*, the Supreme Court of Mississippi had to determine whether Hall's constitutional right to a fair and impartial jury had been violated. *Hall*, 201 So. 3d at 428 (¶11).   The trial court instructed juror number one to act as the foreperson. *Id*. at (¶9).  Hall was ultimately tried and convicted for the murder of Johnny Hubbard. *Id*. at 427 (¶1).  Hall appealed his conviction, raising a number of issues, including that the trial court "erred in instructing Juror Number 1 to act as foreperson." *Id*. at 428 (¶9).  Hall failed to object to this at trial, so he requested that the supreme court review the issue on appeal for plain error. *Id*. The supreme court found that the overwhelming amount of evidence the State presented did not prejudice Hall. *Id*.  Two eyewitnesses had testified against Hall at trial and identified him as the shooter. *Id*.  The supreme court held that because the "weight of the evidence of Hall's guilt was overwhelming, we discern no manifest miscarriage of justice or that the fairness, integrity, or public reputation of the judicial proceeding was seriously affected." *Id*. at 428-29 (¶12).

¶58.    As discussed in Parts I, II, and III, the State presented sufficient evidence that would lead a reasonable juror to find the State proved each element of capital murder, third-degree arson, and conspiracy beyond a reasonable doubt.  Like the defendant in *Hall*, two eye-witnesses, Brown and Harden, testified against McLaughlin at trial.  They indicated that there was a plan to rob Porter and that Porter was killed during that robbery.  Further, Mclaughlin's

witness, Rose, testified that when he woke up he saw Brown shoot Porter and McLaughlin take the money. Additional witnesses placed McLaughlin in the black Dodge Charger on the day before and the day of Porter's murder. DNA testing also confirmed that Porter's blood was on the shirt McLaughlin was seen wearing on video the day before Porter was killed. Given the overwhelming evidence the State presented to prove McLaughlin's guilt beyond a reasonable doubt, this Court finds that there was no "manifest miscarriage of justice or that the fairness, integrity, or public reputation of the judicial proceeding was seriously affected" by the prosecutor's questions about McLaughlin's post-*Miranda* silence. *See Id*. Therefore, this Court finds that the prosecutor violated a legal rule when she intentionally elicited a comment from Detective Magee about McLaughlin's post-*Miranda* silence, and the violation of that rule was clear, plain, and obvious. However, the violation did not prejudice McLaughlin because of the overwhelming evidence the State presented. Because we find no reversible error, we affirm as to this issue.

### V.    The trial court did not err in allowing Exhibit S-11 into evidence.

¶59.    McLaughlin argues the trial court erred when it admitted Exhibit S-11, a photograph of Porter's brain removed from his head and sitting on an autopsy table, to prove the pathway of the bullet and the "injury that occurs and why someone dies from a bullet wound like that . . . ." The brain in the photograph has no rods indicating a bullet path or information indicating injuries, and the photograph has no written information on its face directing the jury's attention to a certain part. It is simply a color photograph of the victim's brain removed from his head sitting on an autopsy table.

¶60.    There was no dispute at trial that Porter was killed during an armed robbery.  Further, there was no dispute that Brown shot Porter twice in the back of the head or that Brown was sitting in the middle part of the back seat of the vehicle.  Three witnesses testified to these facts.  Harden testified that Brown asked Porter for the money he withdrew, and then Brown shot him in the head two times. Brown testified that she held the gun to the back of Porter's head and shot him "[t]wice." Rose also testified that he saw Brown shoot Porter.  These facts were already proven without dispute before Exhibit S-11 was introduced during Dr. LeVaughn's testimony.

¶61.    When the State moved Exhibit S-11 into evidence, McLaughlin's attorney objected to the admission of the photograph into evidence claiming it would be "highly prejudicial and not probative."  The State and McLaughlin's attorney approached the bench to discuss the photograph.  The State argued that the photograph was relevant to show "the **actual bullet pathway** and it shows the **injury that occurs** and why someone dies from a bullet wound" like the one Porter suffered. (Emphasis added).  The State also stated that Dr. LeVaughn would use the photograph to "show where the bullet . . . entered and where the bullet was lodged and what occur[s] when that happens . . . ."  McLaughlin's attorney responded, arguing that the jury "is going to know that [Porter] died from a gunshot wound" and offered to stipulate the "trajectory" and origin of the bullet.  The State's response was that the photograph of Porter's brain was the only photograph it brought to show the "**pathway of the bullet**."  (Emphasis added).  The trial court ultimately admitted the photograph into evidence as Exhibit S-11.

¶62.    After the photograph was admitted, Dr. LeVaughn explained the circumstances of the killing and explained Porter's cause of death while the jury was shown Exhibit S-11. Dr. LeVaughn testified that the "injury from wound B is depicted" in Exhibit S-11.[13] Dr. LeVaughn also testified that Porter's cause of death was homicide. Finally, Dr. LeVaughn testified that Exhibit S-11 showed hemorrhaging around the brain stem, which was "a result of the bullet coming through the vertebra." He continued by detailing he pathway of the bullet and Porter's injuries: "[t]he bullet injured the spinal cord right at the base of the brain as it leaves the skull, so the hemorrhage is from the lacerations . . . at the very bottom of the brain . . . in the midline also produced by the bullet."

¶63.    This court reviews a trial court's decision to admit a photograph into evidence for abuse of discretion. *Mosley v. State*, 307 So. 3d 1261, 1268 (¶26) (Miss. Ct. App. 2020). A trial court judge has nearly "unlimited" discretion when determining if photographs can be admitted into evidence, "regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Martin v. State*, 289 So. 3d 703, 705 (¶7) (Miss. 2019) (quoting *Dampier v. State*, 973 So. 2d 221, 230 (¶25) (Miss. 2008)). "Even if the photograph is gruesome, grisly, unpleasant, or even inflammatory, it still may be admitted so long as it has probative value and its introduction serves a **meaningful evidentiary purpose**." *Id.* (emphasis added) (quoting *Beasley v. State*, 136 So. 3d 393, 400 (¶21) (Miss. 2014)). A photograph is considered to have a meaningful evidentiary purpose if it helps describe the "circumstances of the killing, describes the location of the body and cause of death, or

---

[13] There are no notations on the photograph.

35

supplements or clarifies witness testimony." *Beasley*, 136 So. 3d at 400 (¶24).

¶64.    The Mississippi Supreme Court and this Court have found many times that gruesome, grisly, unpleasant, or inflammatory pictures were more probative than prejudicial. *See Bonds v. State*, 138 So. 3d 914, 918 (¶¶7, 10) (Miss. 2014) (finding that a picture of the victim's skull with "decomposing skin falling off, a dislocated mandible, and maggots crawling all around and in the vacant occipital orbits" to show the angle of entry of the bullet was more probative than prejudicial); *Alexander v. State*, 610 So. 2d 320, 338 (Miss. 1992) (holding that a photograph of the victim's opened skull on the autopsy table was more probative than prejudicial); *Moberg v. State*, 303 S. 3d 815, 824 (¶29) (Miss. Ct. App. 2020) (concluding that a photograph of the victim's decomposing body was more probative than prejudicial and depicted findings made during the autopsy); *Williams v. State*, 222 So. 3d 1066, 1073 (¶¶22, 24) (Miss. Ct. App. 2017) (finding an autopsy photograph of a child with her "skull cap removed to show her brain" was more probative that prejudicial because it showed "several different types of [hemorrhages]" that could have caused the child's death).

¶65.    Rarely does this Court or the Mississippi Supreme Court reverse a conviction based on the introduction of a gruesome, grisly, unpleasant, or inflammatory photograph. One rare case is *McNeal v. State*, 551 So. 2d 151, 159-60 (Miss. 1989), where the Mississippi Supreme Court reversed a murder conviction due to the prejudicial nature of photographs, which were introduced into evidence. In *McNeal*, the Mississippi Supreme Court had to determine whether the trial court erred in allowing photographs of the victim's "nude and partially decomposed" body into evidence. *Id*. at 159. The State argued that all the photographs it

used were needed to prove the corpus delicti. *Id*. The Supreme Court disagreed, stating that "the [S]tate could have shown the angle and entry of the bullet wound without the full-color, close-up view of the decomposed, maggot-infested skull." *Id*. The court continued to note that its findings do not mean that a trial court abuses its discretion every time a gruesome or inflammatory photograph is admitted into evidence. *Id*. Rather, trial courts should "carefully consider all the facts and circumstances surrounding the admission of this particular type of evidence." *Id*. A trial court must consider "(1) whether the proof is absolute or in doubt as to the identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury." *Id*.

¶66. A recent case decided by this Court explains how the probative value of a graphic photograph outweighs any prejudice it may create if it is being used to accurately and clearly explain a victim's cause of death to a jury. In *Morrison v. State*, 332 So. 3d 396, 403 (¶39) (Miss. Ct. App. 2022), this Court had to determine whether a photograph of a mother on the autopsy table with her fetus removed from her uterus and lying in her lap was more prejudicial than probative. At trial, when the State attempted to admit the photograph at issue and others into evidence, defense counsel objected and the trial court conducted an examination of the facts and circumstances surrounding the admission of the photograph. *Id*. at 404 (¶44). Ultimately, the trial court allowed the photograph at issue to be admitted. *Id*. at (¶46). Dr. LeVaughn performed the autopsy in *Morrison*, and testified about the photograph. *Id*. at (¶47). Dr. LeVaughn stated that "the striking part about this photograph

37

is that the skin discoloration of the fetus is very cyanotic or purple, which indicates diminished or very low oxygenation." *Id*. Dr. LeVaughn continued, stating that the cause of death was "acute hypoxia," which meant that the fetus died of low, rapid oxygen as a result of the gunshot wound to its mother. *Id.* at 405 (¶47). This Court found that the photograph had probative value because it "supported Dr. LeVaughn's testimony regarding the cause and circumstances of the death of Octavia's unborn child." *Id.* at (¶48). This Court found that although the photograph was gruesome, it was necessary to support Dr. LeVaughn's testimony about the fetus's cause of death. *Id*. at (¶50).

¶67. The admission of Exhibit S-11 is similar to the photograph at issue in *Morrison*. In *Morrison*, the State only had two photographs that could be used to show the fetus's cause of death. *Id*. at 404 (¶45). Additionally, in *Morrison*, Dr. LeVaughn relied on the image of the fetus to explain what hypoxia was, that the fetus died from acute hypoxia, and how the fetus's skin color proves acute hypoxia as the cause of death meaning the child was alive at the time its mother was shot. *Id.* at 405 (¶47). Here, the State offered the photograph at issue to prove the pathway of the bullets and the "injury that occurs and why someone dies from a bullet wound like that . . . ." Dr. LeVaughn relied on Exhibit S-11 when he testified as to the pathway of the bullets "through the vertebra" and to the "hemorrhage around [Porter's] brainstem."[14] Therefore, this Court cannot say that the trial court abused its discretion in

---

[14] Dr Levaughn had already testified that "the bullet entered the back of the neck and it went forward. It went through the vertebra, the spinal cord, and was recovered from the back of the throat area and kind of the mid neck area in what we call the pharynx or the back of the throat." Be that as it may, this Court reviews an admission of a photograph under an abuse of discretion standard.

admitting a photograph which ultimately was demonstrated by the witness to have meaningful evidentiary value.

### VI. McLaughlin is not entitled to a new trial based on retroactive misjoinder.

¶68. Finally, McLaughlin argues that his convictions of capital murder, third-degree arson, and conspiracy should be reversed because of the retroactive misjoinder of his conviction of felon in possession of a firearm. Retroactive misjoinder "occurs when a trial or appellate court determines that while joinder of two or more counts against a defendant was initially proper, one or more of those counts should be vacated." *Jones v. State*, 316 So. 3d 217, 222 (¶18) (Miss. Ct. App. 2021) (quoting *Reynolds v. State*, 227 So. 3d 428, 433 (¶22) (Miss. Ct. App. 2017)). If the defendant can show that he "suffered clear and compelling prejudice as a result of the evidence used to support the vacated count" he or she will be entitled to a new trial on the remaining counts. *Brent v. State*, 247 So. 3d 367, 371 (¶15) (Miss. Ct. App. 2018) (quoting *Reynolds*, 227 So. 3d at 434 (¶23)). Retroactive misjoinder applies to a defendant if he was "prejudiced by evidence admissible only on a charge that failed or was invalid as matter of law." *Jones*, 316 So. 3d at 222 (¶19) (quoting *Reynolds*, 227 So. 3d at 434 (¶25)). To determine if the defendant was prejudiced on the remaining counts, this Court should analyze the strength of the State's evidence against the defendant on the remaining counts, the evidence that was presented to prove the vacated count, and other relevant details from the defendant's criminal trial and case. *Brent*, 247 So. 3d at 371 (¶15).

¶69. In this case, McLaughlin was charged with felon in possession of a firearm in count four of the indictment. McLaughlin was convicted for that crime. That charge was for the

39

firearm found in the green Ford Explorer, not the firearm used to kill Porter. At trial, McLaughlin's attorney argued that the charge of felon in possession of a firearm should be dismissed because McLaughlin's indictment did not specify which firearm he was being charged with possessing. There were three different firearms in this case—the firearm used to kill Porter, the firearm Porter had, and the firearm found in the green Ford Explorer when McLaughlin was arrested. The State informed the court that the charge of felon in possession of a firearm related to the firearm found in the green Ford Explorer when McLaughlin was arrested. The court denied McLaughlin's motion to dismiss that charge. During the trial, Detective Magee testified that the firearm in the Ford Explorer belonged to Johnny Stevens. The jury returned a guilty verdict for the charge of felon in possession of a firearm. McLaughlin's attorney filed a motion for new trial or JNOV, and the judge set aside the jury verdict and acquitted McLaughlin of the charge of felon in possession of a firearm.

¶70.   McLaughlin argues that he is entitled to a new trial on the remaining counts because of retroactive misjoinder. We disagree. McLaughlin did not suffer "clear and compelling prejudice as a result of the evidence used to support the vacated count." *See id*. The State presented evidence that related to McLaughlin's possession of the firearm that was found in a green Ford Explorer. Investigator Watts testified that the "silver Jimenez JA-22lr handgun" was found with one live round in it during the search of the vehicle after McLaughlin's arrest. During his testimony, the jury was shown a photo of the handgun under the seat of the vehicle. Detective Magee testified that Johnny Stevens actually owned the revolver.

¶71.   The evidence used to support the vacated count of felon in possession of a firearm did

not prejudice McLaughlin's defense on his other counts. Further, this Court must review the strength of the State's evidence against McLaughlin on the remaining counts–capital murder, third-degree arson, and conspiracy–and determine if the evidence was still strong enough to support those convictions. As discussed above in sections I, II, and III, the State presented sufficient evidence to convict McLaughlin of capital murder, third-degree arson, and conspiracy. Therefore, McLaughlin is not entitled to a new trial on his remaining charges as a result of the possession of a firearm by a convicted felon conviction being set aside and dismissed.

## CONCLUSION

¶72. Upon review of the record, this Court finds that there was sufficient evidence that could lead a rational juror to find that the State proved the essential elements of capital murder, third-degree arson, and conspiracy beyond a reasonable doubt. Additionally, due to the overwhelming evidence of his guilt, we find that McLaughlin was not prejudiced under a plain-error analysis when his post-arrest silence was elicited by testimony in front of the jury. Further, we find no abuse of discretion by the trial court in admitting the photograph of the victim's brain because the State sufficiently proved an evidentiary purpose. Finally, this Court finds that the doctrine of retroactive misjoinder does not warrant a reversal of McLaughlin's three standing convictions. Accordingly, we affirm McLaughlin's convictions and sentences for capital murder, third-degree arson, and conspiracy.

¶73. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ.,**

41

**CONCUR.**